Melissa Dumas, Plaintiff-Appellant,†

v.

Robert Koebel and
Journal Communications, Inc.,
Defendants-Respondents.

Court of Appeals

*No. 2013AP365.—Decided Briefs October 8, 2013.
—Decided November 5, 2013.*

2013 WI App 152

(Also reported in 841 N.W.2d 319.)

† Petition for Review denied May 22, 2014.

13

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Richard H. Schulz* of Milwaukee, and *Peter J. Schulz, pro hac vice*, of San Diego, California.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Robert J. Dreps* of *Godfrey & Kahn, S.C.*, of Milwaukee.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. CURLEY, P.J. Melissa Dumas appeals the trial court's grant of summary judgment on the three claims—invasion of privacy, intentional infliction of emotional distress, and intentional interference with a contractual relationship—she alleged against Defendants Robert Koebel and Journal Communications, Inc. Defendants broadcast a news story about Milwaukee Public School (MPS) bus drivers with convictions, in which one of Journal Communications' reporters, Koebel, confronted Dumas, a school bus driver, about a past misdemeanor prostitution conviction. Dumas argues that the trial court erred in limiting discovery before deciding Defendants' summary judgment motion. She also argues that summary judgment on her claims was improper as a matter of law. We conclude that: (1) the trial court properly exercised its discretion in limiting discovery; (2) Dumas' invasion of privacy claim is precluded by WIS. STAT. § 995.50(2)(c) (2011–12)[1] because the information in Defendants' broadcast was "available to the public as a matter of public record"; and (3) Dumas' intentional tort claims are precluded by the First Amendment because Defendants' broadcast discussed "a matter of public concern" as defined by *Snyder v. Phelps*, 131 S. Ct. 1207 (2011). As such, we affirm.

## BACKGROUND

¶ 2. On about April 26, 2012, the TMJ-4 (owned by Journal Communications) investigative reporting team, known as the "I-team," aired a news broadcast concerning MPS bus drivers who had criminal records. In the broadcast, one of the I-team's reporters, Koebel, explained how the team made its "explosive" discover-

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

ies; pursuant to public records supplied by the school district, the I-team received a list of over one thousand bus drivers working for the ten or so companies hired by the district to provide busing services to school children. After the I-team received the list, it "got to work" looking into the background of "each" driver. "The I-team searched public records, police reports and . . . used mug shots to confirm the identit[ies] of convicted criminals[] turned bus drivers."

¶ 3. While the broadcast never stated exactly how many bus drivers were found to have criminal records, it did highlight the histories of three bus drivers with convictions—one of whom was Dumas. Koebel reported that Dumas had received, eight years earlier, a misdemeanor conviction for prostitution. Koebel revealed salacious details from the police report, including various items that Dumas had brought to a hotel to provide a "good time." Koebel also reported that Dumas had been arrested for "drugs and driving on a suspended license," and that Dumas had been in a school bus accident in 2009 when she worked for a different bus company.

¶ 4. The broadcast featured footage of Koebel confronting Dumas in public with her mug shot and old police reports, and questioning her about her misdemeanor conviction. Dumas, as one might expect, was visibly shocked by Koebel's questioning. The broadcast also showed footage of Koebel sharing information about Dumas' misdemeanor conviction with Dumas' manager at the bus company and of the manager saying that she had no knowledge of the conviction.[2]

---

[2] It should be noted at this point that Dumas claimed in her brief opposing Defendants' motion to dismiss that her employment application expressly directed her not to list misdemeanor convictions, and the Defendants did not dispute this fact.

¶ 5. In addition, the Defendants' broadcast featured footage of Koebel confronting MPS Director of Business Services, Mike Turza, about the district's failure to "randomly" check bus drivers' backgrounds, in which the following exchange took place:

> ROB KOEBEL: Will the district start randomly checking backgrounds?
>
> MIKE TURZA: We could do that . . . .
>
> ROB KOEBEL: Will you do that now?
>
> MIKE TURZA: We could do that.
>
> ROB KOEBEL: But you aren't going to commit to that now?
>
> MIKE TURZA: Again, we would commit if there was value to it . . . .
>
> ROB KOEBEL: Ok, the value would be the safety of the children and to hold the bus company accountable[; it] doesn't seem anyone is doing that.
>
> MIKE TURZA: I don't think that is a fair statement at all.

(Quotation marks omitted.)

¶ 6. In concluding the broadcast, Koebel noted that the I-team "presented all of its findings to MPS and the bus companies," and that Dumas was consequently no longer employed as a bus driver, and another featured driver—the "wrong-way driver carrying a gun"—had "been suspended, pending an investigation." "But," Koebel warned in closing, "there could be many convicted criminals still driving buses. And that's information you, as parents, and as tax payers[,] have the right to know."

¶ 7. After the broadcast aired, Dumas sued Defendants for invasion of privacy, intentional infliction of

emotional distress, and intentional interference of a contractual relationship. When the complaint was filed, Dumas' counsel also noticed Koebel's deposition.

¶ 8. Defendants filed a motion to dismiss and a motion to stay discovery until after the motion to dismiss was heard. In their motion to dismiss, Defendants argued that Dumas' invasion of privacy claim must be dismissed because the information published about her in the broadcast was a matter of public record. Defendants also argued that Dumas' other tort claims were similarly precluded because they were "entirely premised on the . . . report of truthful information about her," and were consequently barred by the First Amendment. In support of the motion, Defendants submitted various exhibits, including a video recording of the broadcast; the "internet version of the news story," which appears to be a transcript of the video; and records relating to Dumas' arrest and driving history.

¶ 9. The trial court held a hearing on Defendants' motions and converted the motion to dismiss to a motion for summary judgment. The trial court then heard argument regarding Defendants' motion to stay discovery. Dumas' attorney explained that he wanted to depose Koebel before the motion was decided, but admitted that he did not know what information would be gleaned from the deposition:

> [COUNSEL]: We had filed a notice of deposition to Mr. Koebel with the complaint, which I think is what kind of spurred this whole motion probably to delay things. But we would like to take his deposition. And I don't know where that would lead us. That's the only thing. I don't know what documents he's going to bring . . . .

Counsel for Defendants responded that, because the motion was premised on the fact that Dumas' claims

were barred by the First Amendment because they were matters of public record, any discovery should be limited to that issue.

¶ 10. The trial court decided that it would allow discovery only "as it relates to whether the information was obtained through public records." It stated that it would not allow any further discovery.

¶ 11. About two months later, the trial court heard oral arguments on Defendants' converted summary judgment motion and granted summary judgment on all Dumas' claims. Dumas now appeals. Additional background information will be developed as necessary.

## Analysis

¶ 12. Dumas appeals the trial court's decision to limit discovery and the grant of summary judgment. She argues that the trial court erroneously exercised its discretion in limiting discovery to whether the information in Defendants' broadcast was obtained through public records. She also argues that the trial court erred as a matter of law in granting summary judgment. We discuss each issue in turn.

### A. The trial court did not err in limiting discovery.

¶ 13. Dumas first argues that the trial court erred in limiting discovery to whether the information in Defendants' broadcast was obtained through public records. We review the trial court's discovery order for an erroneous exercise of discretion. *Lane v. Sharp Packaging Sys., Inc.*, 2002 WI 28, ¶ 19, 251 Wis. 2d 68, 640 N.W.2d 788. As the appellant, Dumas has the

21

burden " 'to show that the trial court misused its discretion,' " and we consequently " 'will not reverse unless such misuse is clearly shown.' " *See id.* (citation omitted). Under this standard, we will sustain the trial court's decision if we determine that the trial court "examined the relevant facts, applied a proper standard of law, and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." *See Sands v. Whitnall Sch. Dist.*, 2008 WI 89, ¶ 13, 312 Wis. 2d 1, 754 N.W.2d 439. "In conducting our review, we must examine the [trial] court's on-the-record explanation of the reasons underlying its decision." *Olivarez v. Unitrin Prop. & Cas. Ins. Co.*, 2006 WI App 189, ¶ 17, 296 Wis. 2d 337, 723 N.W.2d 131. While the trial court should state its reasons, they " 'need not be exhaustive.' " *Id.* (citation omitted). Moreover, "[w]e will search the record for reasons to sustain the trial court's exercise of discretion." *Lofthus v. Lofthus*, 2004 WI App 65, ¶ 21, 270 Wis. 2d 515, 678 N.W.2d 393.

¶ 14. Specifically, Dumas argues that the trial court did not provide reasons for its decision on the record. She also argues that the trial court's ruling prevented her from developing facts that would answer the question of whether Dumas' intentional tort claims were precluded by the First Amendment because the information in Defendants' broadcast was "a matter of public concern," as discussed by *Snyder*.

¶ 15. Dumas has not met her burden to show that the trial court erroneously exercised its discretion. *See Lane*, 251 Wis. 2d 68, ¶ 19. While the trial court did not provide a detailed explanation for its decision on the record, it did grant Defendants' request to limit discovery after receiving briefing and hearing extensive argument from both sides. While the trial court permitted discovery to proceed on whether the information was

obtained through public records, it agreed with Defendants' request to limit inquiry into Koebel's editorial judgment. At the motion hearing, Defendants explained that they sought, in particular, to limit questioning of Koebel to whether he obtained his information from public records and to exclude questioning relating to his "editorial judgment."

> [COUNSEL FOR DEFENSE]: Well, our position is that any discovery on this motion should be related to the issues raised by this motion. And that may include appropriate questioning of Mr. Koebel, but not on all the issues plaintiff mentioned in their brief and in their complaint going to matters of editorial judgment, like what's ambush journalism, and what is reasonably necessary . . . . Those are matters of editorial judgment the First Amendment does not allow the plaintiff to discover . . . .

¶ 16. Moreover, contrary to what Dumas argues, the trial court's decision comports with the legal standards governing the summary judgment motion. An action for invasion of an individual's right to privacy may not lie if the information communicated is "available to the public as a matter of public record." *See* Wis. Stat. § 995.50(2)(c). Similarly, "[t]he Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits" if the allegedly tortious communication "is of public . . . concern." *Snyder*, 131 S. Ct. at 1215. As we will discuss in more detail below, knowing whether the information Defendants relied upon came from public records is relevant to both inquiries. While Dumas argues that the discovery ruling limited her ability to develop facts that would concern the second standard—*i.e.,* whether the communication was a "matter of public concern"—Dumas does

not present any specific examples of how the trial court's ruling limited her discovery or what she would have found had the trial court not issued its ruling. As noted, Dumas' counsel could not even surmise a guess at the motion hearing about what relevant facts Koebel's deposition might unveil.

¶ 17. In sum, given the aforementioned circumstances, the trial court's decision to limit discovery was not an erroneous exercise of discretion.

*B. Summary judgment was properly granted on all of Dumas' claims.*

¶ 18. Dumas next argues that the granting of summary judgment on her three claims was improper. We review *de novo* the grant or denial of summary judgment, employing the same methodology as the circuit court. *See Smaxwell v. Bayard*, 2004 WI 101, ¶ 12, 274 Wis. 2d 278, 682 N.W.2d 923. We will affirm a summary judgment if there exists no genuine issue of material fact and if the movant is entitled to judgment as a matter of law. *Novak v. American Family Mut. Ins. Co.*, 183 Wis. 2d 133, 136, 515 N.W.2d 504 (Ct. App. 1994); Wis. Stat. § 802.08(2). The inferences to be drawn from the underlying facts are to be viewed "in the light most favorable to the party opposing the motion." *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶ 23, 241 Wis. 2d 804, 623 N.W.2d 751. If there is any reasonable doubt regarding whether there exists a genuine issue of material fact, that doubt must be resolved in favor of the nonmoving party. *Schmidt v. Northern States Power Co.*, 2007 WI 136, ¶ 24, 305 Wis. 2d 538, 742 N.W.2d 294.

¶ 19. As we will explain in more detail below, summary judgment on Dumas' invasion of privacy claim must be granted because the information communicated in Defendants' broadcast was available to the public as a matter of public record. Summary judgment on both her intentional infliction of emotional distress and intentional interference with a contract claims must be granted because the information communicated was a matter of public concern.

 1. *Dumas' invasion of privacy claim fails because the information published in Koebel's report was a "matter of public record."*

■

¶ 20. Pursuant to WIS. STAT. § 995.50(2)(c), an action for invasion of an individual's right to privacy may not lie if the information communicated is "available to the public as a matter of public record." *See also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) ("the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in . . . records open to public inspection"). There is no dispute that Dumas' history—including the misdemeanor conviction highlighted in Koebel's report—is a matter of public record. *See id.*

¶ 21. The issue Dumas presents on appeal is whether her *name,* which Defendants obtained via a public records request, is a matter of public record. Although we have already concluded that the names, and drivers license numbers, of school bus drivers required to be disclosed in an open records law request is a matter of public record, *see Atlas Transit, Inc. v. Korte*, 2001 WI App 286, ¶¶ 5, 14, 26, 249 Wis. 2d 242, 638 N.W.2d 625 ("We conclude that the public has a right to know the names of the individuals who are

driving their children to and from school."), Dumas argues that her name was confidential pursuant to WIS. STAT. § 19.36(12), which was enacted after we decided *Atlas Transit, see* 2003 Wis. Act 47, § 7, and that consequently, WIS. STAT. § 995.50(2)(c) does not bar her claim.[3]

¶ 22. We are not convinced that release of Dumas' name was precluded by WIS. STAT. § 19.36(12). It provides:

> INFORMATION RELATING TO CERTAIN EMPLOYEES. Unless access is specifically authorized or required by statute, an authority shall not provide access to a record prepared or provided by an employer performing work on a project to which s. 66.0903, 103.49, or 103.50[4] applies, or on which the employer is otherwise required to pay prevailing wages, if that record contains the name or other personally identifiable information relating to an employee of that employer, unless the employee authorizes the authority to provide access to that information. In this subsection, "personally identifiable information" does not include an employee's work classification, hours of work, or wage or benefit payments received for work on such a project.

¶ 23. Dumas claims that this statute requires her name to be kept confidential because the bus companies

---

[3] Dumas characterizes the issue of whether her name is a matter of public record as an issue of fact. It is, in fact, a question of law. *See Atlas Transit, Inc. v. Korte*, 2001 WI App 286, ¶¶ 9, 14, 249 Wis. 2d 242, 638 N.W.2d 625.

[4] WISCONSIN STAT. § 66.0903, titled "Municipal prevailing wage and hour scales," concerns pay rates for municipal public works projects (formatting omitted). WISCONSIN STAT. § 103.49, titled "Wage rate on state work," concerns pay rates for state public works projects (formatting omitted). WISCONSIN STAT. § 103.50, titled "Highway contracts," concerns pay rates for highway projects (formatting omitted).

26

were "required to pay prevailing wages"; however, she does not support her argument with any authority.[5] *See State v. Pettit*, 171 Wis. 2d 627, 646–47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals need not consider undeveloped arguments); *see also Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990) (court of appeals has neither duty nor resources to " 'sift and glean the record' " for facts supporting a party's argument) (citation omitted); *see also Atlas Transit*, 249 Wis. 2d 242, ¶¶ 20–23 (explaining that no state or federal law prevents disclosure of bus drivers' names upon public records request). Moreover, Dumas points to no authority overruling *Atlas Transit*. We therefore conclude that *Atlas Transit*, not Wis. Stat. § 19.36(12), applies here.

¶ 24. Therefore, because *Atlas Transit*, not Wis. Stat. § 19.36, governs the case before us, we conclude Dumas' name was a matter of public record. Because the information published in Koebel's report—including Dumas' name and arrest history—was a matter of public record, we must affirm the grant of summary judgment on Dumas' invasion of privacy claim. *See* Wis. Stat. § 995.50(2)(c).

---

[5] The only information Dumas cites to support her contentions is the letter from the Milwaukee Public Schools Office of Board Governance that initially denied Defendants' public records request for bus drivers' names. The district later decided to release the names of the bus drivers. We also note, for the sake of argument, that even if we would have found the bus drivers names to be wrongfully released, Dumas' dispute would have been with the district, not with Defendants. *Cf. The Florida Star v. B.J.F.*, 491 U.S. 524, 538 (1989) ("Where, as here, the government has failed to police itself in disseminating information, it is clear . . . that the imposition of damages against the press for its subsequent publication can hardly be said to be a narrowly tailored means of safeguarding anonymity.").

2. *Dumas' intentional infliction of emotional distress and intentional interference with a contract claims fail because the information published in Koebel's report was a "matter of public concern."*

¶ 25. Having concluded that summary judgment is proper for Dumas' invasion of privacy claim, we turn to Dumas' intentional tort claims. The trial court determined, and the Defendants argue on appeal, that summary judgment must be granted on both Dumas' intentional infliction of emotional distress and intentional interference with a contract claims because they are barred by the First Amendment. We agree.

¶ 26. "The Free Speech Clause of the First Amendment[6] . . . can serve as a defense in state tort suits." *Snyder*, 131 S. Ct. at 1215. At issue is whether the allegedly tortious communication "is of public or private concern." *See id.*

> Speech deals with matters of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]" The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern."

*Id.* at 1216 (citations and quotation marks omitted).

██ ██

¶ 27. In deciding whether speech is of public concern, we are required to independently examine the

---

[6] The First Amendment to the United States Constitution provides, in relevant part: "Congress shall make no law . . . abridging the freedom of speech, or of the press."

28

whole record to analyze "the content, form, and context" of the speech. *See Snyder*, 131 S. Ct. at 1216 (quotation marks omitted). "In considering content, form, and context, no factor is dispositive," and we "evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *See id.* If we determine that the allegedly tortious speech is a matter of public concern, we must grant summary judgment on the tort claims alleged against Defendants. *See id.* at 1214, 1221 (affirming judgment as a matter of law on intentional tort claim).

¶ 28. With the proper standard in mind, we turn to Defendants' broadcast. The broadcast was titled "Exposing MPS bus drivers with criminal records," and its purpose, given the facts highlighted and the surrounding discussion, was to inform the public that there were bus drivers who had criminal histories responsible for transporting MPS students and question whether the school district was thoroughly researching the backgrounds of bus drivers. The broadcast provided specific details on the histories of three drivers with criminal backgrounds, one of whom was Dumas. Undoubtedly, Dumas was embarrassed by the airing of the salacious details of her misdemeanor conviction, and certainly the way in which Koebel confronted both Dumas and her manager at the bus company with Dumas' history was embarrassing. However, whether the information aired was "controversial" or "inappropriate" is not the standard we must apply. *See id.* at 1216.

¶ 29. While the information aired about Dumas was undoubtedly embarrassing, we conclude that it *was* a matter of public concern. In the broadcast, details of Dumas' misdemeanor conviction and other arrests appeared as part of a story about individuals with convic-

tions being entrusted with the safe transport of children. At one point, Koebel confronted MPS Director of Business Services, Mike Turza, about the district's failure to "randomly" check bus drivers' backgrounds. Also, in the broadcast, a parent expressed his frustration with the fact that the district allegedly did not conduct more extensive background checks on its bus drivers. The focus of the broadcast was not to present Dumas' history without context, but to use it to illustrate a perceived problem. As we concluded in *Atlas Transit*, "the public has a right to know . . . the individuals who are driving their children to and from school." *See id.*, 249 Wis. 2d 242, ¶ 26. In other words, whether public school bus drivers have criminal histories is a matter of public concern.

¶ 30. We find support for our holding in the Supreme Court's *Snyder* decision. In *Snyder*, a group of picketers who believed "that God hates and punishes the United States for its tolerance of homosexuality, particularly in America's military," rallied near the funeral of a Marine who had been killed in the line of duty. *Id.*, 131 S. Ct. at 1213. The picketers carried signs that "stated, for instance: 'God Hates the USA/Thank God for 9/11,' 'America is Doomed,' 'Don't Pray for the USA,' 'Thank God for IEDs,' 'Thank God for Dead Soldiers,' 'Pope in Hell,' 'Priests Rape Boys,' 'God Hates Fags,' 'You're Going to Hell,' and 'God Hates You.' " *See id.* The Marine's family sued the picketers for various torts, including intentional infliction of emotional distress. *Id.* at 1214. Although a jury found in the family's favor on the intentional infliction of emotional distress claim, the Supreme Court ultimately held that the picketers were entitled to judgment as a matter of law because the picketers' speech was protected by the First

Amendment. *See id.* at 1214 (relating appellate court's holding), 1221 (affirming appellate court).

¶ 31. *Snyder's* reasoning is particularly instructive. First, in evaluating the "content" of the picketers' signs, the Court determined that they related to "broad issues of interest." *See id.* at 1216. The Court explained that although the signs fell "short of refined social or political commentary, the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy— are matters of public import." *See id.* at 1216–17. Much the same can be said of the publishing of Dumas' history. Some of the information was salacious, but it did highlight a matter of public import: whether such a history should have prohibited an individual from working as a school bus driver. Second, in evaluating the "context" of the picketers' signs, the *Snyder* Court noted that the picketers stood on public land and that there was no preexisting relationship or conflict between the picketers and the Marine that might suggest that the "speech on public matters was intended to mask an attack . . . over a private matter." *See id.* at 1217. Likewise, Koebel confronted Dumas in public and asked her questions about public information, and Dumas did not allege any facts showing that she had a preexisting relationship with either Koebel or Journal Communications that would suggest a veiled attempt at a private attack. Finally, in evaluating form, the Court noted that "[t]he protest was not unruly; there was no shouting, profanity, or violence. The record confirms that any distress occasioned by [the picketers] turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself." *See id.* at 1218–19. While Dumas takes issue with the

31

way in which Koebel confronted her, and does appear visibly shocked in the broadcast, it is clear to this court that any surprise, embarrassment, and indignation arose from the content of Koebel's speech, which included the details of her misdemeanor prostitution conviction.

¶ 32.　Moreover, we are not persuaded by Dumas' arguments on appeal.[7] Dumas claims, citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), that the First Amendment may serve as a defense against intentional infliction of emotional distress claims only in cases involving public figures. While the *Hustler* case did deal with a public figure, *see id.* at 47–48, as we have already seen by examining *Snyder*, the issue before us—whether a defendant's speech is a matter of public concern—is not so limited. *See Snyder*, 131 S. Ct. at 1220–21 (precluding tort liability for speech offensive to the family of a deceased Marine because speech was a "matter of public concern"). Dumas also claims, citing Article 1, Section 3 of the Wisconsin Constitution,[8] that Defendants should be held liable because the broadcast

---

[7] Dumas presents numerous arguments on appeal, some of which are difficult to follow and/or are insufficiently supported. To the extent we do not address an argument we conclude it is not dispositive. *See State v. Waste Mgmt. of Wis., Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147 (1978).

[8] Article 1, Section 3 of the Wisconsin Constitution provides:

> Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

was not published "with good motives and for justifiable ends." However, that inquiry is not before us as this is not a libel case. *See id.* Additionally, Dumas claims that there are "issues of fact" regarding whether Defendants' speech was a matter of public concern. However, as we already explained, this is a question of law. *See Snyder*, 131 S. Ct. at 1215–16.

¶ 33. In sum, because the information conveyed by Defendants' broadcast was a matter of public concern, we conclude that Dumas' intentional tort claims are precluded by the First Amendment, and that summary judgment must be granted.

*By the Court.*—Judgment affirmed.