PER CURIAM.
¶1 Robert Burke appeals from an order affirming a family court commissioner decision to impute approximately $13,400 in monthly income to him for the purpose of modifying his child support obligation. Robert, although represented on appeal, presents a litany of assertions that are oftentimes difficult to decipher. We perceive his arguments to be that the circuit court erred in two ways related to the child support order: (1) by imputing income to him without sufficient evidence; and (2) by frustrating Robert's efforts to present "evidence" regarding his income and the income of his former spouse, Carrie Baehman. Robert also argues the court erred by failing to address Carrie's purported "theft" of one of their children's college funds. We conclude Robert's arguments do not reflect what actually occurred at the relevant hearing or are otherwise meritless. Accordingly, we affirm the order.
BACKGROUND
¶2 Robert and Carrie jointly petitioned for legal separation in 2003. The parties entered into a marital settlement agreement, and a judgment of legal separation was granted on November 7, 2003. At the time of their separation, the parties had two minor children: Samantha, age six; and Paige, age two. The judgment of legal separation was subsequently converted to a judgment of divorce.
¶3 The children's physical placement and custody were the subjects of orders entered in 2004, 2005, 2006, 2007 and 2010. In 2011, the State of Wisconsin, concerned that the children's basic needs were not being met without public assistance, sought to modify the child support order and requested that the circuit court determine matters related to the children's health care expenses and insurance.[1] Robert ultimately stipulated to provide health insurance for the children.
¶4 In June 2014, Robert filed a motion seeking modification of the placement order. In handwriting at the bottom of the form, Robert also requested that the circuit court order "protection of college funds." The State filed a motion seeking to change the amount of Robert's child support payments, representing that Robert was possibly in arrears and that his income had changed substantially since the last support order. A guardian ad litem was appointed for the children and, following a hearing at which both Robert and Carrie appeared pro se, the family court commissioner entered a written order requiring equal shared placement of Paige. Samantha had attained the age of majority prior to the order's entry. The order did not address the college fund for Samantha, and it is unclear whether Robert pursued the issue at the motion hearing on January 13, 2015.[2]
¶5 It is also unclear what exactly transpired subsequent to the January 2015 hearing, but it is apparent that Robert, Carrie and the State continued to litigate the issue of child support.[3] On March 31, 2015, a court commissioner ordered that Robert's obligation to pay child support was suspended for approximately three months. Carrie was required to make biweekly child support payments of a nominal amount to Robert during the period of suspension, after which Robert's obligation to pay child support would resume at approximately $200 biweekly. As part of the order, the commissioner observed that Robert was self-employed and grossed approximately $3700 biweekly. The commissioner also found that Carrie grossed approximately $1600 in biweekly salary.
¶6 Carrie sought a de novo hearing on the child support issue, and she retained counsel. Throughout the summer of 2015, Robert and Carrie continued motion practice related to Paige's insurance and reimbursement for certain of the children's expenses. They were also at loggerheads over discovery on these matters, with Robert seeking a protective order and Carrie filing a motion to compel.
¶7 The circuit court addressed both child support and the discovery disputes at a hearing on June 26, 2015. Carrie's attorney stated that when he was retained, he discovered "inconsistencies" regarding Robert's income and then he sought to obtain documents showing Robert's financial position.[4] Her attorney represented that Robert owned his own automobile businesses, had a significant number of rental properties collectively worth more than $3 million, had just built an expensive home, and owned a number of boats and vehicles, including a Maserati. Robert maintained that Carrie was entitled to only limited discovery regarding his assets, and the State's position was that there was no evidence Robert was intentionally diverting funds that could be used for child support toward his asset purchases.
¶8 The circuit court concluded Robert's tax returns did not provide sufficient "background information," and it determined Carrie was entitled to further disclosure of Robert's income-producing property and his monthly income and expenses. Based upon an error in the State's calculation of child support, the court subsequently entered a written order modifying the amount of Robert's biweekly child support payments to $251.63. The written order reserved jurisdiction over the issue of the amount of the child support payments.
¶9 The family court commissioner heard further proceedings in August and September 2015 related to the parties' various requests for reimbursement of Paige's expenses.[5] Robert sought modification of the amount of one of the reimbursable items. In an email to Carrie's attorney related to that issue, Robert again raised the matter of Samantha's college fund, asserting that Carrie had "spent the ... funds and now I am suppose[d] to pay it all." On October 26, 2015, Robert filed a motion for a de novo hearing before the circuit court.
¶10 The circuit court ultimately resolved matters concerning the variable expenses by a written order entered April 11, 2016. As part of that order, the court observed that Robert had "commendably contributed significant amounts towards Samantha's education. However, post high school educational expense is not a responsibility of the parents unless specifically agreed to in the judgment of divorce." The court did require Carrie to provide documentation to Robert regarding Samantha's college fund, showing the then-current balance as well as any withdrawals since January 1, 2013.
¶11 In June 2016, Robert filed a motion seeking to eliminate his child support obligation.[6] In July, the family court commissioner signed an order to show cause based upon Carrie's assertion that a substantial increase in Robert's income warranted modification of the amount of child support. The commissioner held a hearing on the child support issue on July 26, 2016.[7] The commissioner found that it was necessary for Robert to supply additional financial information and ordered that he do so prior to August 20, 2016.
¶12 On August 19, 2016, Robert filed numerous financial documents with the family court commissioner, including a financial disclosure statement and his personal tax returns from 2015. Robert also submitted the 2015 tax returns and other financial documents for two of his businesses, Century Automotive and Century Auto Sales. Meanwhile, Robert filed motions with both the circuit court and the family court commissioner seeking to hold Carrie in contempt for failing to supply documentation regarding Samantha's college fund.
¶13 At a hearing on October 4, 2016, the family court commissioner addressed the outstanding issues regarding child support, reimbursable expenses, and the college fund.[8] Carrie submitted a memorandum that included an accounting analysis of Robert's income, as well as documentation of Robert's extensive real estate holdings and of a third business he owned, Century Investments. The commissioner found there had been a substantial change in circumstances regarding the parties' finances and imputed monthly income of approximately $13,400 to Robert. The commissioner acknowledged Carrie was unemployed and receiving unemployment benefits, and it imputed to her approximately $3500 in monthly income.
¶14 Ultimately, the family court commissioner ordered that Robert make biweekly child support payments in the amount of approximately $500, or about $1085 per month. The commissioner also ordered Robert to reimburse Carrie approximately $85 per month for Paige's health and dental insurance, with that amount being classified "additional child support." Finally, the commissioner required Carrie to comply with the circuit court's order requiring her to provide documentation regarding Samantha's college fund.
¶15 Robert filed a motion for a de novo hearing from the family court commissioner's order. In an addendum to the de novo hearing request, Robert explained the specific issues on which he was requesting a new hearing:
Carrie was order[ed] to produce the college funds under direct questioning she denied they existed. [sic] I then produced a copy of cancelled checks from my family totaling $5000 and one statement from Wells Fargo proving they existed and she was the Guardian (sole[l]y) from prior to [the divorce]. Those College Funds were never split as a marital asset because they belong to our daughter. Also Child Support was based on 3 time[s] my tax returns?
Robert also submitted a one-page position statement with approximately fifty pages of unnumbered exhibits attached, many of which contained Robert's handwritten notations regarding their significance.
¶16 Robert, Carrie and the State appeared for a de novo hearing before the circuit court on December 19, 2016. The court first addressed the scope of the hearing, finding that Robert's hearing request had raised only two issues for decision: (1) a review of the family court commissioner's child support order; and (2) whether the commissioner properly required Carrie to provide documentation regarding Samantha's college fund. It then inquired as to the parties' positions on those matters. The circuit court did not open the hearing for the presentation of formal evidence, but rather it allowed each party to present their arguments and then questioned them regarding their submissions.
¶17 With respect to the college fund, Carrie acknowledged that a pre-divorce college fund existed into which she and Robert had contributed for Samantha's college education. However, she stated the account had been "rolled over [into] my 401[k]s" and the money had been placed in a single account, into which Carrie made monthly contributions. Carrie represented that a second account had been set up for Paige after the parties were divorced. Robert argued that the accounts were kept out of the property division because they belonged to the children. The court stated that if Robert could submit documentation within three days showing that the marital settlement agreement or divorce judgment required that certain accounts be set aside on the children's behalf, it would order a historical summary of everything that had happened to the money in those accounts. Robert, who was unrepresented by counsel at the hearing, responded, "All right. Fair enough."
¶18 The circuit court next addressed Robert's disagreement with the family court commissioner's determination of his income. Among other things, Robert challenged the commissioner's apparent determination that Robert's income included amounts he had deducted as depreciation for tax purposes on his significant rental real estate holdings. Robert attempted to present an income analysis, apparently from an accounting firm. However, the individual who purportedly prepared the analysis was not present in court to testify, and Carrie objected to the analysis on hearsay grounds. Robert also sought to delay the court's ruling for one to two months, when, he argued, he would have the year-end numbers from his businesses.
¶19 The circuit court remarked that the child support issue "may require accountants on both sides." Although Robert wanted the court to use his tax returns as the measure of his income, Carrie urged the court to "look at how he's living" and find that Robert was earning substantially more than the income reflected on his tax returns. Based on Robert's various disclosures, Carrie estimated his actual income was approximately $263,000 per year, which included: (1) income, including depreciation, from his rental activities; and (2) income and retained earnings from his businesses. The State supported affirming the family court commissioner's decision, noting that tax returns were not always reflective of true income and that even the tax returns the agency had received from Robert were inconsistent as to his income.
¶20 Robert acknowledged the discrepancy between his taxable income and his lifestyle, but he offered several explanations for it. He first claimed he was making $65,000 per year, his cars were owned by his dealership, and any retained earnings in his businesses and depreciation were not properly included in his income. Later, Robert stated he had "inherited a lot of money." After the circuit court pointed out that any inheritance should have been listed on Robert's financial disclosure statement, Robert stated he could explain. However, he then said, "We don't have time for that right now," adding that he "live[d] different out of the box than most people." Robert ultimately claimed that he "[took] out ten charge cards a year" and used the bonus "points" to make purchases. When Robert also sought to shift the focus to Carrie's income by suggesting that the man with whom Carrie was cohabitating was contributing significantly to her income, the court observed that the family court commissioner had attributed imputed income to Carrie in an amount that appeared reasonable.
¶21 The circuit court stated it had "concerns regarding the multimillion dollars of property that [Robert] holds and yet claims to get little to nothing on a monthly basis from operating those rental properties, which does not make sense to this Court." The court noted that Robert's lifestyle was clearly inconsistent with his financial disclosure form, which appeared to show he was grossing $4200 monthly. However, because the court had not yet seen some of the documentation that was before the family court commissioner, it was not prepared to make a determination at the hearing. Also, it found that the income analysis Robert submitted was unverified and incomplete. Ultimately, the court took the matter under advisement and ordered Robert to provide a supplemental listing of his properties and update his financial disclosure statement with any other sources of income.
¶22 After receiving an updated financial disclosure statement and a narrative "motion to reconsider" from Robert, the circuit court affirmed the family court commissioner's decision imputing to him approximately $13,400 in monthly income. Based on the evidence of Robert's "relatively extravagant lifestyle" and his admitted significant real estate holdings, the court concluded that "[a]djusted gross income for the IRS and Department of Revenue in this instance does not accurately reflect actual money available for payment of child support." The court declined to consider depreciation as income, but it nonetheless concluded Robert's annual income included $62,400 in wages, $56,986 in profits from Century Auto Sales, and $61,654 in profits from Century Automotive.
¶23 The circuit court's order also addressed the college fund dispute. The court noted that Carrie had repeatedly failed to comply with court directives requiring her to provide information about Samantha's college account. Carrie was again ordered to produce annual year-end account statements for Samantha's custodial accounts from January 1, 2013, to the present, including any deposits or withdrawals from those accounts. The court ordered that if the account statements were not provided by February 25, 2017, Carrie would be assessed a sanction of $25 for each day of noncompliance. Robert now appeals.
DISCUSSION
¶24 We pause here to observe that Robert's briefs are a convoluted thicket of individually numbered assertions from which it is exceedingly difficult to cull out arguments. Much of his brief appears to be copied-and-pasted transcript pages, administrative regulations and other written materials lacking any clear context. The circuit court, too, expressed difficulty in utilizing Robert's submissions:
I have spent weeks reviewing stuff on this case in the past where I have received a 12-inch pile of documents. I spend a weekend reviewing them. That's not the job of the Court. It really is not. Things have to be provided, Mr. Burke, in a form that I can make a ruling. You haven't done that.
Robert continues this trend of largely incoherent filings despite now being represented by counsel on appeal. We make these observations largely to explain that, to the extent this opinion does not address an argument Robert intended to make, we omit such discussion because we deem that argument undeveloped and inadequately briefed, and we decline to address it. See State v. Pettit , 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).
¶25 We begin with the child support order. We perceive Robert to be making two central arguments: (1) that the circuit court lacked sufficient evidence to impute $13,400 in monthly income to him; and (2) that the court somehow erred by "refusing" to allow Robert to present evidence regarding his or Carrie's income at the December 2016 hearing. Each of these main themes contains several subarguments, including Robert's assertion that the circuit court failed to consider Carrie's income. However, nothing that Robert presents warrants reversal.
¶26 First, Robert contends the circuit court improperly imputed income to him for purposes of calculating his child support payments. A court may modify child support in the exercise of its discretion upon a showing that there has been a substantial change in circumstances. Winkler v. Winkler , 2005 WI App 100, ¶ 23, 282 Wis. 2d 746, 699 N.W.2d 652. Here, Robert does not contend-at least not directly-that the parties' circumstances had not sufficiently changed to warrant modification. Rather, he argues the court's calculation of his income was unsupported by the evidence and the resulting order was "erroneous on its face."
¶27 "Once a substantial change in circumstances has been shown, the trial court must exercise its discretion as to modification of child support." Id. , ¶ 24. The court is generally required to follow a percentage standard established by the Wisconsin Department of Children and Families (DCF), which for one child is seventeen percent. WIS. STAT. § 767.511(1j) ; see also WIS. ADMIN. CODE § DCF 150.03(1) (June 2018).[9] Under that regulation, it is also proper, under certain conditions, for the court to adjust income based upon undistributed business earnings, earning capacity, and asset ownership. WIS. ADMIN. CODE § DCF 150.03(2)-(4) (June 2018).
¶28 Here, we perceive no error in the circuit court's calculation of Robert's income, which was based on documents he provided to the court. In the financial disclosure statement Robert filed with the court following the December 2016 hearing, he represented that he was receiving $5200 in monthly remuneration-$3000 in wages and $2200 in unspecified "other" income. The court appears to have multiplied Robert's wages by twelve to reach an annual salary of $62,400. The profit and loss statements Robert submitted for Century Auto Sales and Century Automotive showed profits of approximately $28,500 and $31,000, respectively, for the first six months of 2016.[10] The court appears to have multiplied these figures by two to reach its determination that Robert's annual profits from these ventures were, respectively, about $57,000 and $62,000.
¶29 Although the three annual figures, added together, total more than $180,000, the circuit court affirmed the family court commissioner's determination that his annual income was only approximately $160,000. Moreover, the State's brief ably demonstrates that the court would have had sufficient grounds to justify an even greater imputation of income. For example, the court observed Robert owned real property with an approximate net value of over $1.2 million.[11] The court found that if $1.2 million was invested at a "relatively conservative" four-percent interest rate, Robert could be earning nearly $50,000 more per year-yet, its calculations did not include that amount. The court agreed with Robert that depreciation would not be counted as income, but the court appears not to have imputed any income to Robert for his significant rental activities.
¶30 Still, Robert complains the circuit court made "no effort to ascertain the complete picture," considered only his income, and "improperly took Mrs. Baehman[']s income and contribution abilities out of the equation." To the contrary, the court imputed to Carrie more than $3500 in monthly income. As the State's brief demonstrates, the court could reasonably conclude, by using Robert's own information as well as the DCF formulas for shared placement and high-income payers, that Carrie's expected child support contribution offset with Robert's contribution in such a way as to create an approximate $1085 monthly child support obligation on Robert's part. Although Robert complains the court did not articulate these calculations in its order, our obligation on appeal is to search the record for reasons to sustain the court's exercise of discretion. See Dumas v. Koebel , 2013 WI App 152, ¶ 13, 352 Wis. 2d 13, 841 N.W.2d 319.
¶31 Relatedly, Robert baldly argues that the amount of child support he was ordered to pay was on its face "grossly disproportionate" for one child. Robert claims the circuit court's order results in him paying $2210 monthly, or $26,000 annually, to support one child. The exaggerated numbers Robert posits have no factual basis in the court's order, however. The order clearly results in Robert paying approximately $1085 in child support per month, or about $13,000 annually.
¶32 We next consider Robert's complaints about how the circuit court conducted the December 19, 2016 hearing and thereafter determined the amount of his income. Robert argues the court erred by "ordering the production of an expert for the Appellant only."[12] To the contrary, no such order ever occurred. The section of the transcript Robert cites in support of his argument is ambiguous. Specifically, after Carrie articulated her concerns about bearing the cost of the ongoing litigation, the court simply stated Robert could produce an expert, who would then be subject to cross-examination by Carrie.
¶33 Robert's next argument is that the circuit court erred by "denying" him the ability to present expert testimony. Again, this did not occur. We presume that if an expert had accompanied Robert to the hearing, the expert would have been permitted to testify. Indeed, the court, at several points, remarked that its preference was to have expert testimony on both sides. However, despite requesting de novo review and having notice of the hearing, Robert failed to produce any witnesses to testify. Robert presumably knew well in advance of the hearing that he wanted to present his accountant's testimony. The court was not required to reschedule or continue the hearing merely for Robert's convenience. Similarly, it was not required to accommodate Robert's request to wait months for him to obtain year-end numbers for his businesses, and Robert does not argue the court erroneously exercised its discretion in refusing to do so.
¶34 Finally, Robert contends the circuit court "[e]rred in failing to address the Appellee[']s theft of the children's college savings accounts." Robert argues Carrie's statements at the December 2016 hearing show "[t]he accounts were serendipitously confiscated and rolled over into the Appellee[']s own retirement account."[13] Robert argues it was "clear error" for the court both to "award property excluded from the marital res to a party in a divorce" and to fail to address Carrie's purported theft of the accounts.
¶35 We reject all of Robert's argument regarding the savings accounts. The circuit court provided Robert with an opportunity to show that Carrie's treatment of the accounts was not consistent with the parties' marital settlement agreement or the divorce judgment. Robert does not assert that he complied with the court's request to submit the specific provisions in the agreement or judgment that Carrie was alleged to have violated. On appeal, Robert cites only generally to the marital settlement agreement. We therefore deem his argument both inadequately briefed and lacking in adequate record citation. See Roy v. St. Lukes Med. Ctr. , 2007 WI App 218, ¶ 10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256 ("We have no duty to scour the record to review arguments unaccompanied by adequate record citation."); see also Pettit , 171 Wis. 2d at 646.
¶36 In any event, it is not clear how the circuit court erred, even assuming Robert did comply with the court's request to substantiate his claim. Contrary to Robert's argument, the court did not "fail to address" the alleged conversion of Samantha's college fund. Rather, the order required Carrie to disclose all activity in the account after January 1, 2013. That was precisely the remedy Robert agreed was appropriate at the December 2016 hearing. In addition, recognizing that Carrie had repeatedly failed to comply with similar previous directives, the court attached a potentially significant financial penalty to Carrie's continued failure. There is no basis for Robert's present suggestion that the court was required to do more.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

See Wis. Stat. § 767.205(2) (2015-16). The State was represented by the Outagamie County Child Support Agency.
All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The appellate record does not include a transcript of the January 13, 2015 hearing.

The appellate record does not contain any of the parties' filings relating to the State's child support motion subsequent to the January 13, 2015 hearing. Only the resulting March 31, 2015 order is included in the appellate record.

In an action in which the circuit court has ordered child support, the parties are required to exchange financial information annually. See Wis. Stat. § 767.54.

The appellate record appears to include, in one record entry, two orders of the family court commissioner, one dated August 2015 and another dated September 2015. Only a portion of the September 2015 order appears to be included.

Robert had written a letter to the circuit court in May 2016, again raising concerns about Samantha's college fund and seeking to hold Carrie in contempt of court. The circuit court directed Robert to file an appropriate motion with the family court commissioner.

The transcript of the July 26, 2016 proceedings is not in the appellate record.

The transcript of the October 4, 2016 proceedings is not in the appellate record.

The revision of child support orders is governed by Wis. Stat. § 767.59. It too requires that the circuit court follow the percentage standard unless other factors suggest a different calculation is warranted. See § 767.59(2).

Robert's reply brief cites to his updated financial disclosure statement in which he wrote that Century Automotive showed a net loss in 2015 of $4725. This citation does not demonstrate error on the part of the court in estimating his 2016 profit and, in any event, Robert presents no reason why the court was not entitled to rely on his submissions to the family court commissioner.

Robert's updated financial disclosure statement showed he owed approximately $2.5 million in debt on properties, with those properties having a collective fair market value of over $3.75 million.

The argument section of Robert's brief-in-chief consistently refers to the parties by their party designation rather than by name. That practice is a clear violation of the Rules of Appellate Procedure. See Wis. Stat. Rule 809.19(1)(j). We admonish Robert's counsel, who is an experienced appellate litigator in this court, that future violations of the Rules of Appellate Procedure may result in sanctions. See Wis. Stat. Rule 809.83(2).

We presume Robert meant to write that the accounts were "surreptitiously confiscated," as-from his perspective-there would be nothing beneficial or happy about the accounts being lost.