*447 Chief Justice Roberts
delivered the opinion of the Court.
A jury held members of the Westboro Baptist Church liable for millions of dollars in damages for picketing near a soldier’s funeral service. The picket signs reflected the church’s view that the United States is overly tolerant of sin and that God kills American soldiers as punishment. The question presented is whether the First Amendment shields the church members from tort liability for their speech in this case.
*448 I
A
Fred Phelps founded the Westboro Baptist Church in Topeka, Kansas, in 1955. The church’s congregation believes that God hates and punishes the United States for its tolerance of homosexuality, particularly in America’s military. The church frequently communicates its views by picketing, often at military funerals. In the more than 20 years that the members of Westboro Baptist have publicized their message, they have picketed nearly 600 funerals. Brief for Rutherford Institute as Amicus Curiae 7, n. 14.
Marine Lance Corporal Matthew Snyder was killed in Iraq in the line of duty. Lance Corporal Snyder’s father selected the Catholic church in the Snyders’ hometown of Westminster, Maryland, as the site for his son’s funeral. Local newspapers provided notice of the time and location of the service.
Phelps became aware of Matthew Snyder’s funeral and decided to travel to Maryland with six other Westboro Baptist parishioners (two of his daughters and four of his grandchildren) to picket. On the day of the memorial service, the Westboro congregation members picketed on public land adjacent to public streets near the Maryland State House, the United States Naval Academy, and Matthew Snyder’s funeral. The Westboro picketers carried signs that were largely the same at all three locations. They stated, for instance: “God Hates the USA/Thank God for 9/11,” “America is Doomed,” “Don’t Pray for the USA,” “Thank God for IEDs,” “Thank God for Dead Soldiers,” “Pope in Hell,” “Priests Rape Boys,” “God Hates Fags,” “You’re Going to Hell,” and “God Hates You.”
The church had notified the authorities in advance of its intent to picket at the time of the funeral, and the picketers complied with police instructions in staging their demonstration. The picketing took place within a 10- by 25-foot plot of public land adjacent to a public street, behind a temporary *449 fence. App. to Brief for Appellants in No. 08-1026 (CA4), pp. 2282-2285 (hereinafter App.). That plot was approximately 1,000 feet from the church where the funeral was held. Several buildings separated the picket site from the church. Id., at 3758. The. Westboro picketers displayed their signs for about 30 minutes before the funeral began and sang hymns and recited Bible verses. None of the picketers entered church property or went to the cemetery. They did not yell or use profanity, and there was no violence associated with the picketing. Id., at 2168, 2371, 2286, 2293.
The funeral procession passed within 200 to 300 feet of the picket site. Although Snyder testified that he could see the tops of the picket signs as he drove to the funeral, he did not see what was written on the signs until later that night, while watching a news broadcast covering the event. Id., at 2084-2086.[1]
B
Snyder filed suit against Phelps, Phelps’s daughters, and the Westboro Baptist Church (collectively Westboro or the *450 church) in the United States District Court for the District of Maryland under that court’s diversity jurisdiction. Snyder alleged five state tort law claims: defamation, publicity given to private life, intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy. West-boro moved for summary judgment contending, in part, that the church’s speech was insulated from liability by the First Amendment. See 533 F. Supp. 2d 567, 570 (2008).
The District Court awarded Westboro summary judgment on Snyder’s claims for defamation and publicity given to private life, concluding that Snyder could not prove the necessary elements of those torts. Id., at 572-573. A trial was held on the remaining claims. At trial, Snyder described the severity of his emotional injuries. He testified that he is unable to separate the thought of his dead son from his thoughts of Westboro’s picketing, and that he often becomes tearful, angry, and physically ill when he thinks about it. Id., at 588-589. Expert witnesses testified that Snyder’s emotional anguish had resulted in severe depression and had exacerbated pre-existing health conditions.
A jury found for Snyder on the intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy claims, and held Westboro liable for $2.9 million in compensatory damages and $8 million in punitive damages. Westboro filed several post-trial motions, including a motion contending that the jury verdict was grossly excessive and a motion seeking judgment as a matter of law on all claims on First Amendment grounds. The District Court remitted the punitive damages award to $2.1 million, but left the jury verdict otherwise intact. Id., at 597.
In the Court of Appeals, Westboro’s primary argument was that the church was entitled to judgment as a matter of law because the First Amendment fully protected West-boro’s speech. The Court of Appeals agreed. 580 F. 3d 206, 221 (CA4 2009). The court reviewed the picket signs and concluded that Westboro’s statements were entitled to First *451 Amendment protection because those statements were on matters of public concern, were not provably false, and were expressed solely through hyperbolic rhetoric. Id., at 222-224.[2]
We granted certiorari. 559 U. S. 990 (2010).
II
To succeed on a claim for intentional infliction of emotional distress in Maryland, a plaintiff must demonstrate that the defendant intentionally or recklessly engaged in extreme and outrageous conduct that caused the plaintiff to suffer severe emotional distress. See Harris v. Jones, 281 Md. 560, 565-566, 380 A. 2d 611, 614 (1977). The Free Speech Clause of the First Amendment — “Congress shall make no law . . . abridging the freedom of speech” — can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress. See, e. g., Hustler Magazine, Inc. v. Falwell, 485 U. S. 46, 50-51 (1988).[3]
Whether the First Amendment prohibits holding West-boro liable for its speech in this ease turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. “[SJpeech on ‘matters of public concern’... is ‘at the heart of the First Amendment’s *452 protection.’” Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U. S. 749, 758-759 (1985) (opinion of Powell, J.) (quoting First Nat. Bank of Boston v. Bellotti, 435 U. S. 765, 776 (1978)). The First Amendment reflects “a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.” New York Times Co. v. Sullivan, 376 U. S. 254, 270 (1964). That is because “speech concerning public affairs is more than self-expression; it is the essence of self-government.” Garrison v. Louisiana, 379 U. S. 64, 74-75 (1964). Accordingly, “speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.” Connick v. Myers, 461 U. S. 138, 145 (1983) (internal quotation marks omitted).
“ ‘[N]ot all speech is of equal First Amendment importance,’ ” however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. Hustler, supra, at 56 (quoting Dun & Bradstreet, supra, at 758); see Connick, supra, at 145-147. That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: “[T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas”; and the “threat of liability” does not pose the risk of “a reaction of self-censorship” on matters of public import. Dun & Bradstreet, supra, at 760 (internal quotation marks omitted).
We noted a short time ago, in considering whether public employee speech addressed a matter of public concern, that “the boundaries of the public concern test are not well defined.” San Diego v. Roe, 543 U. S. 77, 83 (2004) (per curiam). Although that remains true today, we have articulated some guiding principles, principles that accord broad protection to speech to ensure that courts themselves do not become inadvertent censors.
*453 Speech deals with matters of public concern when it can “be fairly considered as relating to any matter of political, social, or other concern to the community,” Connick, supra, at 146, or when it “is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public,” San Diego, supra, at 83-84. See Cox Broadcasting Corp. v. Cohn, 420 U. S. 469, 492-494 (1975); Time, Inc. v. Hill, 385 U. S. 374, 387-388 (1967). The arguably “inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.” Rankin v. McPherson, 483 U. S. 378, 387 (1987).
Our opinion in Dun & Bradstreet, on the other hand, provides an example of speech of only private concern. In that case we held, as a general matter, that information about a particular individual’s credit report “concerns no public issue.” 472 U. S., at 762. The content of the report, we explained, “was speech solely in the individual interest of the speaker and its specific business audience.” Ibid. That was confirmed by the fact that the particular report was sent to only five subscribers to the reporting service, who were bound not to disseminate it further. Ibid. To cite another example, we concluded in San Diego v. Roe that, in the context of a government employer regulating the speech of its employees, videos of an employee engaging in sexually explicit acts did not address a public concern; the videos “did nothing to inform the public about any aspect of the [employing agency’s] functioning or operation.” 543 U. S., at 84.
Deciding whether speech is of public or private concern requires us to examine the “ 'content, form, and context’ ” of that speech, '"as revealed by the whole record.’” Dun & Bradstreet, supra, at 761 (quoting Connick, supra, at 147-148). As in other First Amendment cases, the court is obligated “to 'make an independent examination of the whole record’ in order to make sure that ‘the judgment does not constitute a forbidden intrusion on the field of free expression.’” Bose Corp. v. Consumers Union of United States, *454 Inc., 466 U. S. 485, 499 (1984) (quoting New York Times, supra, at 284-286). In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said.
The “content” of Westboro’s signs plainly relates to broad issues of interest to society at large, rather than matters of “purely private concern.” Dun & Bradstreet, supra, at 759. The placards read “God Hates the USA/Thank God for 9/11,” “America is Doomed,” “Don’t Pray for the USA,” “Thank God for lEDs,” “Fag Troops,” “Semper Fi Fags,” “God Hates Fags,” “Maryland Taliban,” “Fags Doom Nations,” “Not Blessed Just Cursed,” “Thank God for Dead Soldiers,” “Pope in Hell,” “Priests Rape Boys,” “You’re Going to Hell,” and “God Hates You.” App. 3781-3787. While these messages may fall short of refined social or political commentary, the issues they highlight — the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy — are matters of public import. The signs certainly convey Westboro’s position on those issues, in a manner designed, unlike the private speech in Dun & Bradstreet, to reach as broad a public audience as possible. And even if a few of the signs — such as “You’re Going to Hell” and “God Hates You” — were viewed as containing messages related to Matthew Snyder or the Snyders specifically, that would not change the fact that the overall thrust and dominant theme of Westboro’s demonstration spoke to broader public issues.
Apart from the content of Westboro’s signs, Snyder contends that the “context” of the speech — its connection with his son’s funeral — makes the speech a matter of private rather than public concern. The fact that Westboro spoke in connection with a funeral, however, cannot by itself transform the nature of Westboro’s speech. Westboro’s signs, displayed on public land next to a public street, reflect the fact that the church finds much to condemn in modern *455 society. Its speech is “fairly characterized as constituting speech on a matter of public concern,” Connick, 461 U. S., at 146, and the funeral setting does not alter that conclusion.
Snyder argues that the church members in fact mounted a personal attack on Snyder and his family, and then attempted to “immunize their conduct by claiming that they were actually protesting the United States’ tolerance of homosexuality or the supposed evils of the Catholic Church.” Reply Brief for Petitioner 10. We are not concerned in this case that Westboro’s speech on public matters was in any way contrived to insulate speech on a private matter from liability. Westboro had been actively engaged in speaking on the subjects addressed in its picketing long before it became aware of Matthew Snyder, and there can be no serious claim that Westboro’s picketing did not represent its “honestly believed” views on public issues. Garrison, 379 U. S., at 73. There was no pre-existing relationship or conflict between Westboro and Snyder that might suggest Westboro’s speech on public matters was intended to mask an attack on Snyder over a private matter. Contrast Connick, 461 U. S., at 153 (finding public employee speech a matter of private concern when it was “no coincidence that [the speech] followed upon the heels of [a] transfer notice” affecting the employee).
Snyder goes on to argue that Westboro’s speech should be afforded less than full First Amendment protection “not only because of the words” but also because the church members exploited the funeral “as a platform to bring their message to a broader audience.” Brief for Petitioner 44, 40. There is no doubt that Westboro chose to stage its picketing at the Naval Academy, the Maryland State House, and Matthew Snyder’s funeral to increase publicity for its views and because of the relation between those sites and its views — in the case of the military funeral, because Westboro believes that God is killing American soldiers as punishment for the Nation’s sinful policies.
*456 Westboro’s choice to convey its views in conjunction with Matthew Snyder’s funeral made the expression of those views particularly hurtful to many, especially to Matthew’s father. The record makes clear that the applicable legal term — “emotional distress” — fails to capture fully the anguish Westboro’s choice added to Mr. Snyder’s already incalculable grief. But Westboro conducted its picketing peacefully on matters of public concern at a public place adjacent to a public street. Such space occupies a “special position in terms of First Amendment protection.” United States v. Grace, 461 U. S. 171, 180 (1983), “[W]e have repeatedly referred to public streets as the archetype of a traditional public forum,” noting that “ '[t]ime out of mind’ public streets and sidewalks have been used for public assembly and debate.” Frisby v. Schultz, 487 U. S. 474, 480 (1988).[4]
That said, “[ejven protected speech is not equally permissible in all places and at all times.” Id., at 479 (quoting Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U. S. 788, 799 (1985)). Westboro’s choice of where and when to conduct its picketing is not beyond the Government’s regulatory reach — it is “subject to reasonable time, place, or manner restrictions” that are consistent with the standards announced in this Court’s precedents. Clark v. Community for Creative Non-Violence, 468 U. S. 288, 293 (1984). Maryland now has a law imposing restrictions on funeral picketing, Md. Crim. Law Code Ann. § 10-205 (Lexis Supp. 2010), as do 43 other States and the Federal Government. See Brief for American Legion as Amicus Curiae 18-19, n. 2 *457 (listing statutes). To the extent these laws are content neutral, they raise very different questions from the tort verdict at issue in this case. Maryland’s law, however, was not in effect at the time of the events at issue here, so we have no occasion to consider how it might apply to facts such as those before us, or whether it or other similar regulations are constitutional.[5]
We have identified a few limited situations where the location of targeted picketing can be regulated under provisions that the Court has determined to be content neutral. In Frisby, for example, we upheld a ban on such picketing “before or about” a particular residence, 487 U. S., at 477. In Madsen v. Women’s Health Center, Inc., we approved an injunction requiring a buffer zone between protesters and an abortion clinic entrance. 512 U. S. 753, 768 (1994). The facts here are obviously quite different, both with respect to the activity being regulated and the means of restricting those activities.
Simply put, the church members had the right to be where they were. Westboro alerted local authorities to its funeral protest and fully complied with police guidance on where the picketing could be staged. The picketing was conducted under police supervision some 1,000 feet from the church, out of the sight of those at the church. The protest was not unruly; there was no shouting, profanity, or violence.
The record confirms that any distress occasioned by West-boro’s picketing turned on the content and viewpoint of the message conveyed, rather than any interference with the funeral itself. A group of parishioners standing at the very spot where Westboro stood, holding signs that said “God Bless America” and “God Loves You,” would not have been subjected to liability. It was what Westboro said that exposed it to tort damages.
*458 Given that Westboro’s speech was at a public place on a matter of public concern, that speech is entitled to “special protection” under the First Amendment. Such speech cannot be restricted simply because it is upsetting or arouses contempt. “If there is a bedrock principle underlying the First Amendment, it is that the government-may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.” Texas v. Johnson, 491 U. S. 397, 414 (1989). Indeed, “the point of all speech protection ... is to shield just those choices of content that in someone’s eyes are misguided, or even hurtful.” Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U. S. 557, 574 (1995).
The jury here was instructed that it could hold Westboro liable for intentional infliction of emotional distress based on a finding that Westboro’s picketing was “outrageous.” “Out-rageousness,” however, is a highly malleable standard with “an inherent subjeetiveness about it which would allow a jury to impose liability on the basis of the jurors’ tastes or views, or perhaps on the basis of their dislike of a particular expression.” Hustler, 485 U. S., at 55 (internal quotation marks omitted). In a case such as this, a jury is “unlikely to be neutral with respect to the content of [the] speech,” posing “a real danger of becoming an instrument for the suppression of . . . Vehement, caustic, and sometimes unpleas-an[t]’” expression. Bose Corp., 466 U. S., at 510 (quoting New York Times, 376 U. S., at 270). Such a risk is unacceptable; “in public debate [we] must tolerate insulting, and even outrageous, speech in order to provide adequate ‘breathing space’ to the freedoms protected by the First Amendment.” Boos v. Barry, 485 U. S. 312, 322 (1988) (some internal quotation marks omitted). What Westboro said, in the whole context of how and where it chose to say it, is entitled to “special protection” under the First Amendment, and that protection cannot be overcome by a jury finding that the picketing was outrageous.
*459 For all these reasons, the jury verdict imposing tort liability on Westboro for intentional infliction of emotional distress must be set aside.
m
The jury also found Westboro liable for the state law torts of intrusion upon seclusion and civil conspiracy. The Court of Appeals did not examine these torts independently of the intentional infliction of emotional distress tort. Instead, the Court of Appeals reversed the District Court wholesale, holding that the judgment wrongly “attache[d] tort liability to constitutionally protected speech.” 580 F. 3d, at 226.
Snyder argues that even assuming Westboro’s speech is entitled to First Amendment protection generally, the church is not immunized from liability for intrusion upon seclusion because Snyder was a member of a captive audience at his son’s funeral. Brief for Petitioner 45-46. We do not agree. In most circumstances, “the Constitution does not permit the government to decide which types of-otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes.” Erznoznik v. Jacksonville, 422 U. S. 205, 210-211 (1975) (internal quotation marks omitted). As a result, “[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.” Cohen v. California, 403 U. S. 15, 21 (1971).
As a general matter, we have applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech. For example, we have upheld a statute allowing a homeowner to restrict the delivery of offensive mail to his home, see Rowan v. Post Office Dept., 397 U. S. 728, 736-738 (1970), and an ordinance prohibiting picketing *460 “before or about” any individual’s residence, Frisby, 487 U. S., at 477, 484-485.
Here, Westboro stayed well away from the memorial service. Snyder could see no more than the tops of the signs when driving to the funeral. And there is no indication that the picketing in any way interfered with the funeral service itself. We decline to expand the captive audience doctrine to the circumstances presented here.
Because we find that the First Amendment bars Snyder from recovery for intentional infliction of emotional distress or intrusion upon seclusion — the alleged unlawful activity Westboro conspired to accomplish — we must likewise hold that Snyder cannot recover for civil conspiracy based on those torts.
IV
Our holding today is narrow. We are required in First Amendment cases to carefully review the record, and the reach of our opinion here is limited by the particular facts before us. As we have noted, “the sensitivity and significance of the interests presented in clashes between First Amendment and [state law] rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.” Florida Star v. B. J. F., 491 U. S. 524, 533 (1989).
Westboro believes that America is morally flawed; many Americans might feel the same about Westboro. Westboro’s funeral picketing is certainly hurtful and its contribution to public discourse may be negligible. But Westboro addressed matters of public import on public property, in a peaceful manner, in full compliance with the guidance of local officials. The speech was indeed planned to coincide with Matthew Snyder’s funeral, but did not itself disrupt that funeral, and Westboro’s choice to conduct its picketing at that time and place did not alter the nature of its speech.
Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and — as it did here— *461 inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a Nation we have chosen a different course — to protect even hurtful speech on public issues to ensure that we do not stifle public debate. That choice requires that we shield Westboro from tort liability for its picketing in this case.
The judgment of the United States Court of Appeals for the Fourth Circuit is affirmed.

It is so ordered.

 A few weeks after the funeral, one of the picketers posted a message on Westboro’s Web site discussing the picketing and containing religiously oriented denunciations of the Snyders, interspersed among lengthy Bible quotations. Snyder discovered the posting, referred to by the parties as the “epic,” during an Internet search for his son’s name. The epic is not properly before us and does not factor in our analysis. Although the epic was submitted to the jury and discussed in the courts below, Snyder never mentioned it in his petition for certiorari. See Pet. for Cert. i (“Snyder’s claim arose out of Phelps’ intentional acts at Snyder’s son’s funeral” (emphasis added)); this Court’s Rule 14.1(g) (petition must contain statement “setting out the facts material to consideration of the question presented”). Nor did Snyder respond to the statement in the opposition to certiorari that “[t)hough the epic was asserted as a basis for the claims at trial, the petition ... appears to be addressing only claims based on the picketing.” Brief in Opposition 9. Snyder devoted only one paragraph in the argument section of his opening merits brief to the epic. Given the foregoing and the fact that an Internet posting may raise distinct issues in this context, we decline to consider the epic in deciding this case. See Ontario v. Quon, 560 U. S. 746, 759-760 (2010).

 One judge concurred in the judgment on the ground that Snyder had failed to introduce sufficient evidence at trial to support a jury verdict on any of his tort claims. 580 F. 3d, at 227 (opinion of Shedd, J.). The Court of Appeals majority determined that the pieketers had “voluntarily waived” any such contention on appeal. Id., at 216. Like the court below, we proceed on the unexamined premise that respondents’ speech was tortious.

 The dissent attempts to draw parallels between this case and hypothetical cases involving defamation or fighting words. Post, at 471-472 (opinion of Alito, J.). But, as the court below noted, there is “no suggestion that the speech at issue falls within one of the categorical exclusions from First Amendment protection, such as those for obscenity or ‘fighting words.’ ” 580 F. 3d, at 218, n. 12; see United States v. Stevens, 559 U. S. 460, 468-469 (2010).

 The dissent is wrong to suggest that the Court considers a public street “a free-fire zone in which otherwise actionable verbal attacks are shielded from liability.” Post, at 472. The fact that Westboro conducted its picketing adjacent to a public street does not insulate the speech from liability, but instead heightens concerns that what is at issue is an effort to communicate to the public the church’s views on matters of public concern. That is why our precedents so clearly recognize the special significance of this traditional public forum.

 The Maryland law prohibits picketing within 100 feet of a funeral service or funeral procession; Westboro’s picketing would have complied with that restriction.