WATFORD, Circuit Judge,
concurring:
I agree with my colleagues that Christopher Osinger’s conviction and sentence for violating 18 U.S.C. § 2261A should be affirmed, notwithstanding his First Amendment objections. I write separately to add a few additional thoughts on why Osinger’s as-applied challenge fails.
I
I agree with the court that Osinger’s speech isn’t entitled to First Amendment protection because it was “speech integral to criminal conduct.” See United States v. Stevens, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502, 69 S.Ct. 684, 93 L.Ed. 834 (1949). This exception to the First Amendment has been and remains controversial; its boundaries and underlying rationale have not been clearly defined, leaving the precise scope of the exception unsettled. See Eugene Volokh, Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, “Situation-Altering Utterances,” and the Uncharted Zones, 90 Cornell L.Rev. 1277, 1311-26 (2005). But whatever difficulties may arise from application of the exception in other contexts, it surely applies when the defendant commits an offense by engaging in both speech and non-speech conduct, and the sole objective of the speech is to facilitate the defendant’s criminal behavior. In those circumstances, the defendant’s speech loses whatever First Amendment protection it might otherwise have enjoyed, even if the speech, considered in isolation, would be fully protected.
That, in my view, is the proper reading of Giboney. There, a labor union engaged in non-speech conduct that amounted to, as the Court later put it, “a secondary boycott which a State had validly outlawed.” New York v. Ferber, 458 U.S. 747, 762 n. 14, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Specifically, the union orchestrated a series of agreements among Kansas City ice distributors under which they pledged not to sell ice to non-union peddlers, conduct that violated Missouri’s anti-trade-restraint law. Giboney, 336 U.S. at 492, 69 S.Ct. 684. When the lone holdout distributor (Empire) refused to join the boycott, the union “informed Empire that it would use other means at its disposal to force Empire to come around to the union view.” Id. Union members began picketing Empire with placards protesting its willingness to deal with non-union peddlers. The “avowed immediate purpose of the picketing was to compel Empire to agree to stop selling ice to nonunion peddlers” — an agreement that would have been punishable as a felony under Missouri law. Id. Empire sought an injunction prohibiting the picketing.
*951 Although the union was engaged in peaceful picketing that “publicize[d] truthful facts about a labor dispute” — speech which, standing on its own, would have been fully protected under the First Amendment — the Court held that the union’s speech could not be “treated in isolation.” Id. at 498, 69 S.Ct. 684. The union’s speech lost whatever First Amendment protection it might otherwise have enjoyed, the Court concluded, because it was “used as an integral part of conduct in violation of a valid criminal statute,” and its “sole immediate object” was to facilitate the union’s commission of that offense. Id. That the union’s unlawful course of conduct “was in part initiated, evidenced, or carried out by means of language” mattered not for First Amendment purposes. Id. at 502, 69 S.Ct. 684.
Osinger’s case' fits comfortably within this formulation of the exception for speech integral to criminal conduct. As in Giboney, we’re dealing with a valid criminal statute: No one disputes that, as a general matter, Congress has the power to punish those who engage in interstate stalking. And the court properly rejects Osinger’s facial challenge to the particular variant of that crime at issue here — engaging in a course of conduct intending to harass or inflict substantial emotional distress on a person in another State. 18 U.S.C. § 2261A(2)(A). As I’ll sketch out below, Osinger committed the crime of interstate stalking by engaging in a course of conduct that consisted of both speech and non-speech conduct. True, Osinger engaged in some speech that, considered in isolation, might have been entitled to First Amendment protection. But as the court correctly holds, that speech lost whatever protection it might have enjoyed because its “sole immediate object” was to facilitate his commission of the stalking offense. Giboney, 336 U.S. at 498, 69 S.Ct. 684.
II
Like many stalking offenses, this one began with a failed relationship. The victim in this case, V.B., broke up with Osinger when she discovered that he was married to another woman. A few months after V.B. ended their relationship, Osinger began showing up uninvited at V.B.’s home. On multiple occasions, he arrived around 1:00 or 2:00 a.m. and telephoned her or knocked at her window or door. V.B. refused to speak with him, but Osinger continued to make unwanted visits to her home anyway. He also appeared several times at the restaurant where V.B. worked. After these encounters, V.B. moved to another neighborhood, hoping that Osinger’s unwanted visits to her home, at least, would stop.
They didn’t. As a repossession agent, Osinger could easily get addresses for people he wanted to find, and he successfully tracked V.B. down at her new home. The two briefly reconciled, but that ended when V.B. concluded that Osinger had given her fraudulent divorce papers and was seeing other women. After ending their relationship for the final time, V.B. moved in with her sister, hoping Osinger wouldn’t be able to find her there. But despite V.B.’s decision to conceal her new address from Osinger, he surprised her by showing up at her sister’s apartment. He also called her and sent her text messages. V.B. responded by telling Osinger their relationship was over.
After a year of dealing with Osinger’s harassing behavior, V.B. moved from Illinois to California, in part to get away from him. She didn’t tell Osinger where she was moving, and she didn’t give him her new address. For months, she had no direct contact with him. V.B. appeared to have made a clean break: She had a new *952 job, a new home, and what she believed was a fresh start with Osinger out of her life.
Then, out of the blue, Osinger started contacting V.B. again. Over the course of two days, she received approximately 40 text messages from him. The messages started out with declarations of love, but they quickly turned nasty — e.g., “You truly are the Devil ... I hate you I HATE U.” — when V.B. made it clear that she would not give him another chance. From there, Osinger’s messages took on a threatening tone:
• Trust me after this weeknd ur going to feel like I ass FUKD U.
• Am going to make sure u fucking hate me. After this weeknd.
• So buckle up. This ride isn’t over just yet!! ! ...
• If I was you I get a big bottle. To drink. Ur going to need it.
• So enjoy ... What’s to come.
• [A]m about to pull the rug from rite under ur sexxy lil feet!!!
That weekend, Osinger made good on his threats. V.B. got a call from an ex-boyfriend who told her that he had received a “Mend” request from what appeared to be a fake Facebook account set up under her name (with a minor spelling error). When V.B. accessed the Facebook page, she was horrified by what she saw. Someone — Osinger, it turned out — had posted over 30 photos of V.B., many of them sexually explicit, organized into two albums titled “WHORE” and ‘WHORE2.” Some of the photos showed V.B. topless or bottomless. Others showed her partially or fully nude and masturbating. Still others showed her performing oral sex. The statements posted on the page, purportedly made by V.B., included: “I like to go out and be the whore I am I uslly get a job and fuck my bosses rite now I work for [company name redacted] look me up pass my pix around ... I just move to [city redacted],” and “if you want video, just send me ur email.” Osinger sent “Mend” requests to V.B.’s family members and friends to encourage them to view the Facebook page.
V.B. immediately called her boss to enlist his help in taking the Facebook page down before any more of her Mends or family members saw it. During that call, V.B.’s boss told her that one of her coworkers, who also happened to be V.B.’s roommate, had just received a disturbing email sent to his company account. The email, sent by Osinger, stated that he knew the recipient was working with V.B., offered supposed “tips” on what to do if the recipient wanted to sleep with V.B., and ended by saying, “if you want video send a mesg back I got tons.” The email attached some of the photos Osinger had posted on the Facebook page, depicting V.B. partially or fully nude and performing oral sex. Osinger later sent the same email, lewd photos included, to V.B.’s boss and one of V.B.’s former co-workers in Chicago, before the company’s IT department blocked Osinger’s email address.
After learning about the fake Facebook page and the disturbing emails Osinger had sent to her co-workers, V.B. was understandably distraught. As she testified at trial, “I was scared. I did not know what else he was going to try to do.” V.B. quickly sought and received a restraining order against Osinger.
Ill
As these facts show, Osinger engaged in a course of conduct that amounted to interstate stalking. It began in Illinois when he harassed V.B. by repeatedly showing up at her home and workplace, despite her efforts to avoid him. It continued after she moved to California, initially through a *953 string of unwelcome and implicitly threatening text messages, and then through a fake Facebook page and emails sent to VJB.’s co-workers.
The text messages, emails, and Face-book page constitute speech that, considered in isolation, might have been entitled to First Amendment protection. I say “might” because the notion that any of Osinger’s speech should receive full First Amendment protection is certainly debatable. The text messages quoted above were sent only to V.B., an unwilling listener, with no apparent purpose other than to harass or frighten her. See Eugene Volokh, One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and “Cyberstalking, ” 107 Nw. U.L.Rev. 731, 742-43 (2013). They formed part of the basis for Osinger’s prosecution not because of any expressive idea they communicated, see Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 208 (3d Cir.2001), but rather because of the “implicit threat of conduct” they contained. Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist., 605 F.3d 703, 710 (9th Cir.2010). Still, there is no categorical exception to the First Amendment for harassing or offensive speech, id. at 708, and it’s hard to say that the text messages rise to the level of “true threats” under Virginia v. Black, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), the closest recognized exception, given their content and the absence of any history of violence between Osinger and V.B. With respect to the emails and Face-book page, they don’t fall within any currently recognized exception either; the Supreme Court has left unresolved whether the First Amendment protects unauthorized disclosure of intensely private facts about a purely private figure. See Time, Inc. v. Hill, 385 U.S. 374, 383 n. 7, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); cf. Snyder v. Phelps, — U.S. -, 131 S.Ct. 1207, 1217, 179 L.Ed.2d 172 (2011) (suggesting that highly offensive speech on matters of purely private concern might not be insulated from civil liability). All of this is simply a long way of saying that we have to assume Osinger engaged in at least some speech that could be constitutionally protected.
None of that speech is entitled to constitutional protection here, however, because all of it falls within the exception for speech integral to criminal conduct. Osinger used the text messages, emails, and Facebook page “as an integral part of conduct in violation of a valid criminal statute,” Giboney, 336 U.S. at 498, 69 S.Ct. 684 — namely, his ongoing campaign to harass V.B. through repeated unwanted contacts. Unable to harass her in person after she left Illinois, he used speech to continue the campaign. See John B. Major, Note, Cyberstalking, Twitter, and the Captive Audience: A First Amendment Analysis of 18 U.S.C. § 2261A(2), 86 S. Cal. L.Rev. 117, 126 (2012). Because the “sole immediate object” of Osinger’s speech was to facilitate his commission of the interstate stalking offense, that speech isn’t entitled to constitutional protection. Giboney, 336 U.S. at 498, 69 S.Ct. 684.
What makes this a straightforward case is the fact that Osinger committed the offense by engaging in both speech and unprotected non-speech conduct. For the speech-integral-to-criminal-conduct exception to apply, the conduct need not have been criminal on its own; it’s enough if the conduct and speech together “constituted a single and integrated course of conduct, which was in violation of [a] valid law.” Id. Here, the non-speech conduct consisted of in-person harassment, which, together with the text messages, emails, and Face-book page, violated § 2261A(2). In other cases the non-speech conduct might consist of categorically unprotected speech, like the extortionate threats in United States v. *954 Petrovic, 701 F.3d 849, 855 (8th Cir.2012), or non-communicative aspects of speech, like repeated unwanted telephone calls that are harassing due to their sheer number and frequency. See Gormley v. Dir., Conn. State Dep’t of Probation, 632 F.2d 938, 941-42 (2d Cir.1980).
Cases in which the defendant’s harassing “course of conduct” consists entirely of speech that would otherwise be entitled to First Amendment protection are less straightforward. The Court in Giboney made clear that the union’s picketing lost its First Amendment protection only because the union was “doing more than exercising a right of free speech or press.” 336 U.S. at 503, 69 S.Ct. 684. If a defendant is doing nothing but exercising a right of free speech, without engaging in any non-speech conduct, the exception for speech integral to criminal conduct shouldn’t apply. Instead, when pure speech is involved, the Court has suggested that the government’s ability “to shut off discourse solely to protect others from hearing it” depends on “a showing that substantial privacy interests are being invaded in an essentially intolerable manner.” Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). It’s unclear whether this standard would apply in a § 2261A prosecution in which the defendant caused someone substantial emotional distress by engaging only in otherwise protected speech. That is a question whose resolution we wisely leave for another day.