NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Cheshire
No. 2013-885

CITY OF KEENE

v.

JAMES CLEAVELAND & a.

Argued: October15, 2014
Opinion Issued: June 9, 2015

Gallagher, Callahan & Gartrell, P.C., of Concord (Charles P. Bauer and Robert J. Dietel on the brief, and Mr. Bauer orally), for the petitioner.

Backus, Meyer & Branch, LLP, of Manchester (Jon Meyer on the brief and orally), for respondents James Cleaveland, Garrett Ean, Kate Ager, Ian Bernard a/k/a Ian Freeman, and Graham Colson.

Respondent Pete Eyre, for himself, filed no brief.

Nixon Peabody LLP, of Manchester (Anthony J. Galdieri on the brief), and New Hampshire Civil Liberties Union, of Concord (Gilles R. Bissonnette on the brief), for New Hampshire Civil Liberties Union, as amicus curiae.

New Hampshire Municipal Association, of Concord (Stephen C. Buckley, on the brief and orally) as amicus curiae.

BASSETT, J. The petitioner, the City of Keene, appeals an order of the Superior Court (Kissinger, J.) dismissing its claims of tortious interference with contractual relations, negligence, and civil conspiracy, and denying its request for preliminary and permanent injunctive relief. The City filed suit against the respondents, James Cleaveland, Garrett Ean, Kate Ager, Ian Bernard a/k/a Ian Freeman, Graham Colson, and Pete Eyre, because they followed closely behind the City's parking enforcement officers (PEOs) on their daily patrols through downtown Keene, videotaping them, criticizing their work, and putting money into expired parking meters before a parking ticket was issued. After an evidentiary hearing, the trial court dismissed the action, ruling that the City's claims were barred by the First Amendment to the United States Constitution. U.S. CONST. amend. I. The trial court also denied the City's petition for preliminary and permanent injunctive relief. We affirm in part, vacate in part, and remand.

I

The following facts are drawn from the City's pleadings, or were adduced at the evidentiary hearing. The City employs PEOs to enforce motor vehicle parking laws and regulations in Keene. The PEOs patrol downtown Keene on foot and in marked vehicles, monitoring parking meters and issuing parking tickets. In December 2012, the respondents began protesting parking enforcement in Keene. On an almost daily basis, the respondents followed closely behind the PEOs, identifying expired parking meters and filling the meter before a PEO could issue a ticket, a process referred to by the respondents as a "save." When the respondents "save" a vehicle, they leave a card on the vehicle's windshield that reads: "Your meter expired! However, we saved you from the king's tariff!" The respondents also: videotaped the PEOs from a close proximity; called the PEOs names such as "f*****g thief," "coward," "racist," and "b***h"; criticized the PEOs for issuing tickets; encouraged the PEOs to quit their jobs; and waited for the PEOs during their breaks, including waiting outside restrooms. The respondents testified that they engage in these activities to protest parking enforcement because they believe that parking is not a criminal act, and that parking tickets are a "threat against [the] people." The PEOs testified that they repeatedly asked the respondents to stop their activities, complained to the Keene police department, and reported the respondents' activities to the city attorney.

In 2013, the City petitioned for preliminary and permanent injunctive relief, alleging tortious interference with contractual relations and civil

2

conspiracy to commit tortious interference.[1]  The City asserted that the respondents, acting individually and in concert, tortiously interfered with the City's contractual relations with the PEOs by engaging in persistent and ongoing efforts to prevent them from performing their official duties, thus creating a hostile work environment for the PEOs.  The City sought to enjoin the "Respondents, or anyone under their direction, supervision, employment, or control" from "coming within," "video recording," or "communicating with any PEO" within "a safety zone of fifty (50) feet of any PEO while that PEO is on duty performing his or her employment duties as required by the City of Keene."  The City did not seek to prevent the respondents from filling meters.  The petition contained the following statement:

> [The City] does not seek an Order to prevent Respondents from exercising their constitutional rights to video record the PEOs from a comfortable remove or otherwise to express their opinion; rather, [the City] seeks only to prevent Respondents from taunting, interfering with, harassing, and intimidating the PEOs by establishing a safety zone between the PEOs and [the] Respondents while the PEOs are performing their duties.

The respondents filed a motion to dismiss, arguing that the City's petition failed to state a claim for tortious interference, and that the claim violated their right to free speech under the First Amendment of the Federal Constitution and Part I, Article 22 of the New Hampshire Constitution, as well as their right to government accountability under Part I, Article 8 of the New Hampshire Constitution.  See U.S. CONST. amend. I; N.H. CONST. pt. I, arts. 8, 22.

Shortly thereafter, the City filed a separate civil complaint against the respondents, requesting a jury trial and seeking money damages for injuries sustained by the City because of the respondents' tortious interference with contractual relations and negligence.  These claims were based upon the same factual allegations as those set forth in the City's petition for injunctive relief.

The trial court held a three-day evidentiary hearing and heard legal argument on both the City's petition for preliminary injunctive relief and the respondents' motion to dismiss.  The PEOs testified that the close proximity of the respondents — sometimes only a foot away from them — caused the PEOs anxiety and made them feel harassed.  One PEO testified that he was

---

[1] The City's original petition for injunctive relief, filed in May 2013, alleged only tortious interference with contractual relations.  In July 2013, the City filed a motion to amend its petition to add a claim of civil conspiracy.  It appears that the trial court had not ruled on the City's motion to amend at the time of the evidentiary hearing.  However, because the trial court order identifies civil conspiracy as one of the claims filed against the respondents, we construe the order as having implicitly granted the City's motion to amend and briefly address this claim in this opinion.

3

sometimes followed on his patrols by two or three of the respondents at the same time, and that they followed him so closely that if he turned around, they would bump into him. He ultimately resigned because "the constant harassment and intimidation [had] started to boil over into [his] personal life and [his] time off," and he felt he was "backed into a corner." Another PEO testified that she is "tense and uptight all the time" because of the "awful anticipation" of "waiting for [the respondents] to show up," and claimed that she is unable to do her job because she is "trying to avoid [the respondents]." A third, who complained that the respondents waited outside her car and followed her in and out of city buildings on her breaks, testified that she does not feel safe when the respondents follow her at work. She also testified that, on one occasion, one of the respondents grabbed her wrist when she attempted to remove one of the respondents' cards from a car windshield. She has changed her work schedule to avoid the respondents, and has considered quitting her job. The City also offered testimony about the risk to public safety: specifically, that the respondents distract the PEOs as they drive on city streets, and that the respondents "dart[ ] across" the street, which the City asserted could result in pedestrian injuries or vehicle collisions.

Several of the respondents testified as well. Cleaveland stated that an injunction requiring the respondents to stay away from the PEOs would be a "considerable infringement" on the respondents' ability to get their message to the public, and might create an antagonistic environment by requiring the respondents to raise their voices to be heard. The respondents also asserted that distances between five and fifteen feet away from the PEOs were "ideal" for their activities, and that videotaping required closer proximity to the PEOs than filling meters.

During the course of the hearing, the City narrowed its request for injunctive relief. First, rather than seeking the originally requested injunction that would bar the respondents "from coming within" 50 feet of any on-duty PEO, it modified its request, asking that the respondents be prohibited from engaging in "touching, taunting, obstructing, detaining, hindering, impeding, blocking, [and] intimidating or harassing" conduct within a 30-foot "safety zone" around the PEOs. The City explained that it was not seeking to enjoin the respondents from merely "being within the proximity of the officers"; rather, it was seeking to prohibit the respondents from being "in their proximity and engag[ing] in the behavior" alleged. (Emphasis added.) Next, at the close of the hearing, the City again narrowed its requested relief, asking the trial court to order a "safety zone" around an on-duty PEO of 15 feet — approximately the distance between two parking meters — or "any other reasonable injunction that the Court deems appropriate." The City emphasized that it did not seek to restrict the content of the respondents' speech, and acknowledged to the trial court that they had constitutionally protected rights to "videotape," "have discourse," and "get their message out" as long as they did so from "a reasonable distance back." See Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir.

4

2011) ("The filming of government officials engaged in their duties in a public place . . . fits comfortably within [First Amendment] principles."). The City sought to restrict only those aspects of the respondents' conduct that were interfering with the PEOs' ability to perform their jobs.

The trial court granted the respondents' motion to dismiss. After expressing skepticism as to the viability of the City's tortious interference claim under these circumstances, the trial court concluded that it "need not reach this issue as the enforcement of [the tortious interference claim] is an infringement [up]on the Respondents' right to free speech and expression under the First Amendment of the Federal Constitution."

Relying upon Snyder v. Phelps, 131 S. Ct. 1207, 1215-19 (2011), the trial court analyzed the respondents' actions and concluded that their speech and expressive activities involved a matter of public concern and occurred in a traditional public forum — the streets and sidewalks of Keene — and, therefore, were "entitled to special protection" under the First Amendment. Snyder, 131 S. Ct. at 1219. The trial court explained that the First Amendment protects "sharing common views," "peaceful pamphleteering," and the videotaping of government officials, and noted that "[m]erely because many people disagree with the Respondents as to the role of parking enforcement in Keene does not subject their speech and expressive conduct to lesser protections." The trial court observed that, although the City could lawfully impose reasonable time, place, and manner restrictions on the respondents' activities, imposing liability for tortious interference would:

> unreasonably prevent the Respondents[ ] from exercising their right to free speech. . . . [W]hether a tortious interference claim exists depends on whether a jury finds the Respondents' conduct "improper." Such a subjective standard creates an unreasonable risk that the jury will find liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression.

(Quotations and citations omitted.) The court also denied the City's request for injunctive relief, reasoning that neither a temporary nor permanent injunction was warranted "[g]iven the dismissal of the tortious interference claim." This appeal followed.

## II

The City first argues that the trial court erred when it dismissed the City's tortious interference, civil conspiracy, and negligence claims. Although the City acknowledges on appeal that the content of the respondents' speech is constitutionally protected, and that the respondents have a constitutionally protected right to videotape the PEOs, it argues that the respondents' actions

5

— "following closely, chasing, running after, approaching quickly from behind, lurking outside bathrooms, yelling loudly, and filming from close proximity" — constitute "improper" interference with the PEOs' employment duties. The City contends that this conduct is "significantly harassing behavior under the guise of political expression," and, therefore, not constitutionally protected. The City asserts, therefore, that a jury may impose tort liability without unconstitutionally burdening the respondents' right to free speech. The respondents counter that the trial court correctly ruled that it would violate the First Amendment to allow the City's civil claims to proceed to a jury. These arguments present a question of constitutional law; therefore, we review the trial court's analysis de novo. State v. Bailey, 166 N.H. 537, 540 (2014). Although we normally address constitutional questions first under the State Constitution and rely on federal law only to aid in our analysis, see State v. Ball, 124 N.H. 226, 231-33 (1983), because the trial court ruled that the respondents' activities were protected under the Federal Constitution and did not address the respondents' arguments under the State Constitution, we first address the parties' arguments under the Federal Constitution.

To establish liability for tortious interference with contractual relations, a plaintiff must show that: "(1) the plaintiff had an economic relationship with a third party; (2) the defendant knew of this relationship; (3) the defendant intentionally and improperly interfered with this relationship; and (4) the plaintiff was damaged by such interference." Hughes v. N.H. Div. of Aeronautics, 152 N.H. 30, 40-41 (2005) (emphases omitted). Whether the alleged conduct is "improper" requires an "inquiry into the mental and moral character of the defendant's conduct." Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 159 (3d Cir. 1988) (quotation omitted). "Action is not improper when the interference in contractual relations fosters a social interest of greater public import than is the social interest invaded." Id. (quotation omitted); see Restatement (Second) of Torts § 766 cmt. c at 10 (1965) ("The issue is whether in the given circumstances [the defendant's] interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce.").

Initially, we note that we share the trial court's skepticism as to whether a tortious interference claim can exist when private citizens engage in protest of the government. However, we need not decide whether a viable tortious interference claim can exist under the circumstances present in this case because we agree with the trial court that holding the respondents liable for tortious interference based upon their alleged activities would infringe upon the respondents' right to free speech under the First Amendment.

"The Free Speech Clause of the First Amendment — 'Congress shall make no law . . . abridging the freedom of speech' — can serve as a defense in state tort suits . . . ." Snyder, 131 S. Ct. at 1215. "[S]peech constituting a state-law tort is not necessarily unprotected speech," and, as the United States

Supreme Court has made clear, "states may not regulate speech merely because the speech is defined as a state-law tort." Coplin v. Fairfield Public Access Television, 111 F.3d 1395, 1401 n.2 (8th Cir. 1997). That is why the First Amendment bars certain state tort claims. See Snyder, 131 S. Ct. at 1220 (holding that First Amendment bars claims of intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy against non-violent funeral protestors).

Whether speech is constitutionally protected requires an analysis of whether the "speech is of public or private concern, as determined by all the circumstances of the case," including whether the challenged activities take place in a traditional public forum. Id. at 1215. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . ." Id. at 1216. Speech on matters of public concern "is at the heart of the First Amendment's protection." Id. at 1215 (quotation omitted). "That is because speech concerning public affairs is more than self-expression; it is the essence of self-government." Id. "Deciding whether speech is of public or private concern requires us to examine the content, form, and context of that speech, as revealed by the whole record." Id. at 1216 (quotations omitted). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." Id.

On appeal, the City does not challenge the trial court's conclusions that the content of the respondents' speech is protected by the First Amendment because it relates to a matter of public concern, and that the respondents' activities take place in a traditional public forum — the sidewalks and streets of Keene. As the trial court observed, the respondents' speech — criticizing the PEOs for enforcing parking regulations and questioning the City's authority to regulate parking — plainly relates to issues of public concern because it involves challenging "the political authority of the City." Although certain aspects of the respondents' speech — such as referring to the PEOs in a derogatory fashion — may "fall short of refined social or political commentary, the issues they highlight . . . are matters of public import." Id. at 1217. Indeed, the Supreme Court has concluded that the content of protected speech "cannot be restricted simply because it is upsetting or arouses contempt." Id. at 1219.

The City nonetheless asserts that specific aspects of the respondents' conduct — "following closely, chasing, running after, approaching quickly from behind, lurking outside bathrooms, yelling loudly, and filming from close proximity" — are not protected by the First Amendment. The City contends that this particular conduct — the lawfulness of which it continues to challenge, and which, for the purpose of clarity, we will refer to as the "challenged conduct" — has a tortious impact on the PEOs, and it would not

7

violate the First Amendment either for a jury to adjudicate the City's claims, or for the trial court to potentially subject the respondents to tort liability for the challenged conduct. The respondents counter that "[e]ven those activities that did not involve speech [are] expressive conduct entitled to First Amendment protection," and, therefore, are insulated from tort liability. They assert that, "absent acts of significant violence," the First Amendment protects their non-verbal acts from tort liability. We agree with the respondents.

As the Supreme Court has observed, "the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability." NAACP v. Claiborne Hardware Co., 458 U.S. 886, 916-17 (1982). For instance, the First Amendment protects the right of individuals to engage in public protest for the purpose of influencing societal or governmental change, even if that protest activity causes economic harm. See id. at 916; see also State of Mo. v. Nat. Organization for Women, 620 F.2d 1301, 1317 (8th Cir. 1980) ("[T]he right to petition is of such importance that it is not an improper interference even when exercised by way of a boycott."). Further, "[w]hile the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." Claiborne Hardware Co., 458 U.S. at 918. The First Amendment is implicated because the mere threat of tort liability for engaging in protected activity may undermine "the free and robust debate of public issues," and "pose the risk of a reaction of self-censorship on matters of public import." Snyder, 131 S. Ct. at 1215-16 (quotations omitted); cf. Claiborne Hardware Co., 458 U.S. at 931-32 ("The rights of political association are fragile enough without adding the additional threat of destruction by lawsuit." (quotation omitted)).

In Claiborne Hardware Co., a group of merchants sought damages in tort for malicious interference with their businesses — a tort analogous to the tortious interference claim made in this case — after civil rights activists organized a boycott of their businesses. Id. at 889-91. The protesters engaged in a pattern of "intimidation, threats, social ostracism, [and] vilification" of potential black customers to discourage them from patronizing the boycotted establishments. Id. at 894. Some of the protesters committed violent acts. Id. at 916. The Supreme Court concluded that the "use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award." Id. at 933; see also Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971) (allowing organization to hand out leaflets about "practices [that] were offensive to them" because "so long as the means are peaceful, the communication need not meet standards of acceptability"). The Court further held that although violent conduct "is beyond the pale of constitutional protection," because violence did not "color[ ] the entire collective effort," the protesters' non-violent activity was constitutionally protected and not subject to tort liability. Claiborne Hardware Co., 458 U.S. at 933.

Here, the challenged conduct, like the respondents' protected speech, is intended to draw attention to the City's parking enforcement operations and to persuade the PEOs to leave their positions. There is no allegation that the challenged conduct involves violent conduct. See id. at 918. Moreover, conduct "does not lose its protected character . . . simply because it may embarrass others or coerce them into action." Id. at 910. We hold, therefore, that the First Amendment shields the respondents from tort liability for the challenged conduct. Id. at 933. Accordingly, we conclude that the trial court correctly determined that enforcing the City's tortious interference with contractual relations claim would violate the respondents' First Amendment rights. Given this conclusion, we need not reach the respondents' argument that the tortious interference claim is also barred by the State Constitution.

Because we hold that the First Amendment bars the City from pursuing its claim for tortious interference with contractual relations, we also conclude that the First Amendment bars the City from pursuing its claim that the respondents are liable for conspiring to commit the very same tort. See Snyder, 131 S. Ct. at 1220.

The City also argues that the trial court erred when it dismissed the City's negligence claim. However, the City has failed to develop this argument sufficiently for our review. See Auger v. Town of Strafford, 156 N.H. 64, 68 (2007). Therefore, we affirm the trial court's dismissal of the City's claims of tortious interference with contractual relations, civil conspiracy, and negligence.

III

The City next argues that the trial court erred when it denied the City's request for preliminary and permanent injunctive relief. The City contends that the trial court erred when it failed to balance the City's "significant governmental interests" — preserving public safety and providing a safe workplace for its employees — against the respondents' right to free speech before it ruled on the City's request for injunctive relief. The City further asserts that "[t]hese interests provide permissible grounds to grant an injunction," and, therefore, notwithstanding the trial court's dismissal of the tortious interference claim, the trial court should have issued an injunction because of the impact of the challenged conduct upon the City's interests in preserving public safety and protecting the PEOs. The respondents counter that the trial court properly denied an injunction "[g]iven the dismissal of the tortious interference claim," and that injunctive relief is not warranted because the City has not pleaded that the challenged conduct violates a city ordinance or any civil or criminal law. The respondents further contend that the requested injunctive relief would violate their First Amendment rights. The City responds that a municipal ordinance would "run a greater risk of chilling First Amendment rights than a narrowly tailored injunction targeting specific

9

misconduct by specific individuals." The question before us, therefore, is whether the trial court erred when, solely because it had dismissed the underlying tortious interference claim, it denied the City's request for injunctive relief without considering the particular circumstances of the case.

As a threshold matter, we address the respondents' argument that the issue of whether the trial court erred when it denied the City's request for injunctive relief was "not stated as a question presented in [the City's] notice of appeal, and is accordingly improper pursuant to Rule 16(b) of this Court." See Sup. Ct. R. 16(3)(b). Supreme Court Rule 16(3)(b) provides, in relevant part:

> While the statement of a question [in a brief] need not be worded exactly as it was in the appeal document, the question presented shall be the same as the question previously set forth in the appeal document. The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein.

Id. The City's notice of appeal presented the question of "whether the [trial] court erred in failing to balance the public employees' right to work without substantial interference, harassment, and intimidation against the private parties' right[ ] to protest governmental operations[.]" We conclude that the question presented by the City in its notice of appeal fairly encompasses the injunction issue before us. See Axenics, Inc. v. Turner Constr. Co., 164 N.H. 659, 668 (2013).

"It is within the trial court's sound discretion to grant an injunction after consideration of the facts and established principles of equity." Town of Atkinson v. Malborn Realty Trust, 164 N.H. 62, 66 (2012). The decision to grant equitable relief "necessarily depends upon the factual circumstances in each case." Exeter Realty Co. v. Buck, 104 N.H. 199, 200 (1962). "[B]ecause the division line between equity and law is not precise . . . courts have considerable discretion in determining whether equity should intervene to aid litigants in the protection of their legal rights." Sands v. Stevens, 121 N.H. 1008, 1011 (1981) (quotation omitted). We will uphold the decision of the trial court with regard to the issuance of an injunction absent an error of law, an unsustainable exercise of discretion, or clearly erroneous findings of fact. Town of Atkinson, 164 N.H. at 66.

Here, the trial court did not consider the factual circumstances of the case prior to making its determination as to whether injunctive relief was warranted. Although the City expressly pleaded only two underlying claims in its petition for injunctive relief — tortious interference with contractual relations and civil conspiracy — the City also specifically alleged that: (1) the PEOs "felt intimidated and harassed and have been unable to perform their job duties"; (2) the respondents act "with the purpose and intention of preventing

the PEOs from doing their jobs"; (3) the respondents "frequently follow and surround individual PEOs in groups of one, two, or more, an inherently intimidating act;" (4) the respondents "place the PEOs and the public in danger, both by their distracting behavior and also as a result of their disregard for rules of the road"; and (5) the challenged conduct "agitates the public, often creating hostile exchanges between members of the public and [the] Respondents that place the PEOs, the public, and the Respondents in danger," resulting, on one occasion, in a "physical altercation between Respondent Cleaveland and a member of the public."

The City has consistently argued that, even if the tortious interference claim is dismissed, it is entitled to equitable relief based upon its "significant governmental interests" in "providing a safe workplace for its employees" and "preserving public safety and order." The trial court disagreed, and denied the City's request for injunctive relief "[g]iven the dismissal of the tortious interference claim." We hold that the trial court erred when, solely because it had dismissed the underlying tortious interference claim, it denied injunctive relief without considering all the factual circumstances of the case.

Although the City's petition could perhaps have been drafted with more precision, New Hampshire is a notice pleading jurisdiction, and, "[a]s such, we take a liberal approach to the technical requirements of pleadings." Porter v. City of Manchester, 151 N.H. 30, 43 (2004) (quotation omitted). That the City did not set forth its factual allegations and legal theories as a separate count seeking injunctive relief is not fatal to its request; nor does it constrain the trial court in undertaking an inquiry as to whether the specific circumstances of the case warrant equitable relief. See 27A Am. Jur. 2d Equity § 2 (2008) (stating that court sitting in equity is "less hampered by technical difficulties" and "is not shackled by rigid rules of procedure").

In light of the City's allegations that the challenged conduct threatens the safety of the PEOs, pedestrians, and the motoring public, and given the testimony of the PEOs at the hearing, we hold that the trial court erred when it failed to consider the particular factual circumstances of the case and whether an injunction should issue based upon the governmental and policy interests asserted by the City. See Murray v. Lawson, 649 A.2d 1253, 1263 (N.J. 1994) (granting injunction "pursuant to the court's authority to grant equitable relief to enforce a valid public policy of [the] State"); cf. RSA 642:1, I (2007) (making it unlawful to use "intimidation . . . or engage[ ] in any other unlawful conduct with a purpose to hinder or interfere with a public servant"). Accordingly, we vacate the trial court's denial of the City's request for injunctive relief, and remand for the trial court to address the issue of whether the governmental interests and factual circumstances asserted by the City in its petition are sufficient to warrant properly tailored injunctive relief.

"Even protected speech is not equally permissible in all places and at all times." Snyder, 131 S. Ct. at 1218 (quotation and brackets omitted). The respondents' choice of where and when to engage in the challenged conduct "is not beyond the Government's regulatory reach — it is subject to reasonable time, place, or manner restrictions." Id. (quotation omitted); see Bailey, 166 N.H. at 542 (observing that "[f]ederal precedent employs the same standard [as we employ under our constitution] to assess the constitutionality of restrictions on the time, place, and manner of expressive activities taking place in a public forum." (quotation omitted)). We note that content-neutral injunctions that restrict speech or expressive activities must "burden no more speech than necessary to serve a significant government interest" to survive a First Amendment challenge. Madsen v. Women's Health Center, Inc., 512 U.S. 753, 765 (1994). We express no opinion as to whether the City's allegations, if proven, are sufficient to warrant the trial court's exercise of its equitable power, or as to whether the particular injunctive relief requested by the City would violate the Federal or State Constitutions. Those are issues for the trial court to address in the first instance.

Affirmed in part; vacated in part; and remanded.

DALIANIS, C.J., and HICKS, CONBOY, and LYNN, JJ., concurred.

12