NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0480n.06

No. 21-1045

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 25, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MARTIN H. LEAF, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| NIKE, INC.; WIEDEN & KENNEDY, | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| TWITTER, INC.; FACEBOOK, INC.; | ) | |
| GOOGLE, LLC; YOUTUBE LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Before: McKEAGUE, NALBANDIAN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Nike, Inc., released a short, animated film, *The Last Game*, to promote its products ahead of the 2014 World Cup. Martin Leaf alleges that this Nike ad contains hidden anti-Semitic imagery and other offensive content. He sued Nike and its advertising agency under the Michigan Consumer Protection Act. This Act protects consumers who buy or lease goods or services for their personal use from many deceptive business practices, including "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1)(cc). Here, however, Leaf does not allege that he ever even contemplated buying Nike products, let alone that he considered engaging in those "transactions" only because of Nike's positive reassurances that its ad lacked offensive

content. Rather, he treats the Nike ad itself as a "product" and his viewing of this freely available commercial as the "transaction." This reading would effectively transform the Michigan Consumer Protection Act from a narrow regulation of consumer transactions into a broad regulation of internet speech. Because the Act does not reach so far, we affirm the district court's dismissal of Leaf's complaint.

I

Leaf's first amended complaint makes startling factual allegations that we must accept as true at this stage of his suit—whether or not they are, in fact, true. *See Rudd v. City of Norton Shores*, 977 F.3d 503, 507, 511 (6th Cir. 2020). Leaf takes issue with *The Last Game*, an animated film released in advance of the 2014 World Cup that runs for about five minutes. According to Leaf, this film was "engineered to leverage racial Jew-hatred to make more money in a sneaky subliminal way without 'getting caught.'" First Am. Compl., R.16, PageID 520.

The advertising agency Wieden + Kennedy (W+K) co-created *The Last Game* with Nike. The film tells the story of an evil villain who creates a team of soccer-playing clones. These evil clones ruin soccer (and somehow steal the beauty from the world) by winning games through a methodical (yet boring) playing style that takes no risks. A group of international soccer stars unite to come to the sport's (and the world's) rescue. Clad in Nike gear, these stars best the monotonous clones through their dazzling and risky play during "the last game." Billions of people have watched *The Last Game*, and anyone can view it for free on the internet.

In June 2014, Leaf read an article in *The Times of Israel* describing a debate over whether *The Last Game* was anti-Semitic. Some people viewed images in the short film in this light. Others, such as the Anti-Defamation League, thought that this claim was baseless and diminished real anti-Semitism. *Id.*, PageID 527. Leaf decided to watch *The Last Game* on Nike's YouTube

page.  He has viewed this film many times since, including by examining the film's thousands of frames one frame at a time.

Based on these repeated viewings, Leaf concluded that the film contained subliminal anti-Semitic messages, pornography, and terroristic threats.  Most of his first amended complaint goes through the alleged ways in which the film contains offensive content.  Throughout the film, for example, both the uniforms and the home stadium of the evil clones display a soccer-ball logo that at times looks like a Jewish star.  *Id.*, PageID 548.  In addition, the film features various images (such as a skull with a Nike swoosh and a "hook-nosed figure") that Leaf claims resemble Nazi symbols and propaganda.  *Id.*, PageID 534–47.  Frames from the film also allegedly show "pornographic images" of animated characters, including children.  *Id.*, PageID 540, 542, 544.  Leaf asserts that Nike included the anti-Semitic imagery to make more money because of what he describes as the "well documented Jew hatred among European and many South American soccer fans[.]"  *Id.*, PageID 576–77.

When Leaf watched the film and discovered its purportedly offensive content, he claims to have suffered mental distress.  *Id.*, PageID 579–80, 582.  He sued Nike and W+K, alleging that their failure to disclose the film's subliminal messages violated two provisions of the Michigan Consumer Protection Act.  (Leaf sued other entities, but he voluntarily dismissed some of these defendants and failed to serve another.)  Nike and W+K moved to dismiss Leaf's complaint under Federal Rule of Civil Procedure 12(b)(6).

Before the district court could rule on their motion, Leaf sought to file a second amended complaint.  In the proposed new complaint, Leaf alleged that the film also contained terroristic threats, including, for example, the word ISIS with a red axe in the background of one scene.  Second Am. Compl., R.38, PageID 1503–04.  Leaf also alleged that at least one individual

3

responsible for creating *The Last Game* is anti-Semitic, as evidenced by his social media. *Id.*, PageID 1402–18. Leaf further clarified that, before he watched *The Last Game*, he had read a second news article containing Nike's response to the anti-Semitism allegations. According to this article, Nike reassured its audience that the logo on the clones' uniforms was a soccer ball and that "[a]ny resemblance to any other symbol or image within the campaign is entirely coincidental and unintentional." *Id.*, PageID 1429. Nike added: "We respect all religions and the image was in no way designed to cause any offense." *Id.*

The district court held that Leaf's first amended complaint failed to state a claim under the two provisions of the Michigan Consumer Protection Act on which he relied. The first provision required Leaf to allege that Nike and W+K failed to reveal a material fact, that the omission of this fact could mislead consumers, and that consumers could not reasonably discover the omitted fact on their own. Mich. Comp. Laws § 445.903(1)(s). According to the district court, Leaf's complaint failed to assert that he could not have discovered the omitted "material fact" (that *The Last Game* contained subliminal messages) on his own. To the contrary, the complaint alleged that he learned of the film's potential anti-Semitic messages before he viewed it and that he discovered its offensive images when he did.

The second provision required Leaf to allege that Nike and W+K failed to reveal facts about a transaction that became material in light of earlier "positive" representations they had made about that transaction. *See id.* § 445.903(1)(cc). According to the court, Leaf's complaint did not allege that Nike and W+K made any positive representation (for example, that the film was not anti-Semitic) that could trigger any duty to disclose the contrary fact.

The court next denied Leaf's motion to file a second amended complaint as futile. It reasoned that the new complaint also failed to state a claim under subsection (cc) because it still did not assert that Nike made a positive statement about *The Last Game*.

Leaf appeals. We review de novo both the district court's decision to dismiss his complaint and its decision to deny as futile Leaf's request to file an amended complaint. *See Rudd*, 977 F.3d at 511; *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010). To survive a motion to dismiss (or show that the filing of an amended complaint would not be futile), Leaf's first and second amended complaints needed to allege enough facts to state a "plausible" violation of the Michigan Consumer Protection Act. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Seaton v. TripAdvisor LLC*, 728 F.3d 592, 596, 601 (6th Cir. 2013). In addition, Federal Rule of Civil Procedure 9(b) requires complaints to "state with particularity the circumstances constituting fraud[.]" Leaf nowhere challenges the district court's conclusion that this rule applies to his claims under the Act. We thus may assume that Leaf must meet this heightened standard. *Cf. Storey v. Attends Healthcare Prods., Inc.*, 2016 WL 3125210, at *10 (E.D. Mich. June 3, 2016).

II

The Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," Mich. Comp. Laws § 445.903(1), and allows private parties to sue for violations, *id.* § 445.911(1)–(2). Under this Act, "'[t]rade or commerce' means the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity." *Id.* § 445.902(g). For a transaction to fall

within this "trade or commerce" definition, Michigan courts have long held that a customer must buy the good or service primarily for personal use, not for use in the customer's business. *See Slobin v. Henry Ford Health Care*, 666 N.W.2d 632, 634–35 (Mich. 2003) (per curiam); *Jackson Cnty. Hog Producers v. Consumers Power Co.*, 592 N.W.2d 112, 117–18 (Mich. Ct. App. 1999); *Noggles v. Battle Creek Wrecking, Inc.*, 395 N.W.2d 322, 324–25 (Mich. Ct. App. 1986). So an individual who bought a truck for his business could not rely on the Act to challenge the manufacturer's deceptive conduct. *See Zine v. Chrysler Corp.*, 600 N.W.2d 384, 392–94 (Mich. Ct. App. 1999). Nor could a patient rely on the Act to challenge a doctor's medical judgment. *See Tipton v. William Beaumont Hosp.*, 697 N.W.2d 552, 555–58 (Mich. Ct. App. 2005).

The Act contains over thirty specific prohibitions on unfair or deceptive practices for the transactions that fall within its coverage. Mich. Comp. Laws § 445.903(1)(a)–(ll). Michigan courts have recognized that these prohibitions contain language that varies greatly. Some provisions, for example, require express representations; others require factual omissions; and still others mention neither. *See Zine*, 600 N.W.2d at 397. The courts thus follow a provision-by-provision approach to resolve a dispute, paying close attention to the text of the specific subsection at issue. *See id.*; *see also Leaf v. Refn*, 742 F. App'x 917, 926–27 (6th Cir. 2018); *Cormier v. PF Fitness-Midland, LLC*, 2018 WL 3594443, at *2–5 (Mich. Ct. App. July 26, 2018) (per curiam); *DiPiero v. Better Bus. Bureau of W. Mich., Inc.*, 2014 WL 6679406, at *3–4 (Mich. Ct. App. Nov. 25, 2014) (per curiam). We thus will consider each of the subsections on which Leaf relies in turn.

A.  Section 445.903(1)(cc)

Leaf relies primarily on a subsection that prohibits a business from "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1)(cc). This language requires a plaintiff to identify a "transaction."

Because the Act does not define the word, Michigan courts have adhered to its ordinary meaning. *See Zine*, 600 N.W.2d at 396–97. "Transaction" means such things as "something that is transacted, esp. a business agreement" or "an act or agreement . . . in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered." *Id.* (quoting dictionaries). The word thus covers "the mutual and reciprocal acts typical of business deals that alter the legal relationships of the parties." *DiPiero*, 2014 WL 6679406, at *4. This is not a difficult requirement. Many deals—from the purchase of a vehicle to the lease of an apartment—suffice. *See Zine*, 600 N.W.2d at 396–97; *Barnes v. Arbor Circle Apartments*, 2019 WL 2063310, at *1, *5 (Mich. Ct. App. May 9, 2019) (per curiam). Still, the subsection "does not afford a right to [challenge] confusing, false or misleading" statements in the abstract without showing that the statements are connected to some potential transaction between the parties. *DiPiero*, 2014 WL 6679406, at *4. Thus, an unhappy customer of a window supplier could not sue the Better Business Bureau for airing deceptive information about the supplier because the customer did not contemplate entering into any sort of agreement with the Bureau. *Id.*

The subsection next requires that a business fail to disclose a fact about the transaction that is "material" "in light of" the business's earlier "positive" representation. What makes an omitted fact "material"? Michigan courts have looked to the common law of fraud when deciphering this legal term of art. *See Zine*, 600 N.W.2d at 398; *see also Brownlow v. McCall Enters., Inc.*, 888 N.W.2d 295, 305–06 (Mich. Ct. App. 2016) (per curiam). Relying on these common-law sources, the courts have defined "material" to cover only those facts that are "important to the transaction" or that "affect[] the consumer's decision to enter into" it. *Zine*, 600 N.W.2d at 398. To show that an omitted fact is material under subsection (cc), then, a plaintiff must show that the fact could have affected the plaintiff's contemplated transaction with the defendant in light of the defendant's

7

earlier positive statements about the transaction. Thus, when plaintiffs have complained about a factual omission that occurred only after the parties consummated their deal, Michigan courts have repeatedly held that the omission could not have affected the parties' preexisting decision to enter into it. *See id.*; *see also Cap. One Bank USA N.A. v. Ponte*, 2013 WL 6692511, at *5 (Mich. Ct. App. Dec. 19, 2013) (per curiam); *Herbrandson v. ALC Home Inspection Servs., Inc.*, 2004 WL 316275, at *3 (Mich. Ct. App. Feb. 19, 2004) (per curiam); *Wood v. Detroit Mem'l Park Ass'n, Inc.*, 2001 WL 1654940, at *3 (Mich. Ct. App. Dec. 21, 2001) (per curiam).

These transaction and materiality elements make good sense when the statutory language is read against its broader context. The Michigan Consumer Protection Act does not seek to police speech in the abstract—something that would raise First Amendment concerns. After all, outside the commercial context, the First Amendment protects even the offensive anti-Semitic speech that Leaf alleges in this case. *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Collin v. Smith*, 578 F.2d 1197, 1201–07 (7th Cir. 1978). The Act instead protects consumers by regulating the speech that a business uses to convince them to buy or lease its goods or services. *See Cap. One Bank*, 2013 WL 6692511, at *4; *Noggles*, 395 N.W.2d at 324.

Here, Leaf's first and second amended complaints both allege that Nike and W+K violated subsection (cc) by failing to reveal that *The Last Game* contained subliminal offensive content. Yet neither complaint adequately alleges that Nike and W+K failed to disclose a fact that was "material" to a "transaction" between these parties—as that subsection requires.

Leaf's view of the relevant "transaction" is a moving target. At times, his complaints treat *The Last Game* as an ad that promotes the sale of Nike "gear" (its shoes and athletic apparel). Second Am. Compl., R.38, PageID 1396. The second amended complaint, for example, alleges that *The Last Game* sends the "clear message" that "buying Nike gear" will help consumers "save

8

the world" because the soccer stars are wearing that gear. *Id.*, PageID 1534. It elsewhere claims that Nike included the anti-Semitic content to "increase sales of Nike products[.]" *Id.*, PageID 1424–25. Just like the sales of cars, the sales of Nike products would qualify as "transactions" under subsection (cc). *See Zine*, 600 N.W.2d at 397. And if a plaintiff contemplated purchasing, say, Nike shoes based on Nike's representations that *The Last Game* did not contain anti-Semitic content, the failure to reveal the film's allegedly offensive imagery might be material to such a transaction. *See id.* at 398. But Leaf's complaints do not allege that *The Last Game* affected his decision to do *any* "business" with Nike. *DiPiero*, 2014 WL 6679406, at *4. Indeed, the complaints do not identify a single Nike product that Leaf has ever even considered buying—let alone a product that he considered buying based on Nike's positive statements about *The Last Game*. Because Leaf fails to identify any actual or contemplated Nike purchases, he fails to allege that the short film was material to this sort of traditional "transaction." *See Zine*, 600 N.W.2d at 397.

At other times, however, Leaf's complaints seem to treat *The Last Game* itself—not the athletic gear that the company sells—as Nike's "product." Both of his complaints, for example, conclusorily describe the "commercial" as a "product" that Nike disseminated. First Am. Compl., R.16, PageID 581; Second Am. Compl., R.38, PageID 1428. The proposed second amended complaint alleges further that Leaf watched this so-called product only after Nike made "positive" reassurances to the media that the soccer logo on the evil clones' uniforms was not a Jewish star and that the company respects all religions. Mich. Comp. Laws § 445.903(1)(cc); *see* Second Am. Compl., R.38, PageID 1429. This second amended complaint also asserts that Leaf would not have viewed *The Last Game* "in the ordinary manner" or "at all" if Nike had disclosed the allegedly offensive subliminal messages. Second Am. Compl., R.38, PageID 1538.

But Leaf's viewing of *The Last Game*, by itself, is not a "transaction" within the meaning of subsection (cc). Although it involves two or more persons (Nike and Leaf), this ad did not alter their legal relationship. *See Zine*, 600 N.W.2d at 396. Neither Nike nor Leaf undertook any legal obligation or gained any legal right. *See id.* When Leaf watched the video, there was also no transfer of value. The parties "forged no agreement and exchanged no promises." *DiPiero*, 2014 WL 6679406, at *4. Leaf simply went onto Nike's YouTube page and watched an ad. Second Am. Compl., R.38, PageID 1429. Any other person could have done the same thing because Nike made the ad available free of charge. If every viewer of freely available "speech" could treat that speech as a "business deal," it would greatly expand the Michigan Consumer Protection Act beyond its narrow domain of protecting consumers who buy goods or services for personal use. *See Cap. One Bank*, 2013 WL 6692511, at *4. Because, however, "website representations" alone do not generally qualify as "transactions," subsection (cc) does not give everyone who views a representation a right to challenge it as deceptive—irrespective of whether a viewer has any intent to buy any associated products or services. *See DiPiero*, 2014 WL 6679406, at *4.

Regardless, even if Leaf's viewing of this ad could be considered a "transaction," Leaf has failed to plead with particularity the materiality of Nike's alleged omitted fact. *Cf. Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016); *Minzer v. Keegan*, 218 F.3d 144, 151 (2d Cir. 2000). His second amended complaint simply concludes that he would not have watched *The Last Game* if he had known of the alleged anti-Semitism within it. Second Am. Compl., R.38, PageID 1538. Yet the rest of his complaint contradicts this bare allegation— one resembling a legal conclusion that merely parrots the materiality requirement. *Cf. Iqbal*, 556 U.S. at 678–79. Leaf did not plead that he was an unsuspecting soccer fan who came across the short film in anticipation of the World Cup. Rather, he pleaded that he watched the film only after

10

viewing articles debating whether it was anti-Semitic. Second Am. Compl., R.38, PageID 1427–29. These allegations show that Leaf knew of the film's potential offensive content before he watched it. Yet he went ahead and did so, frame by frame. If anything, the complaint's specifically alleged facts (in contrast to its legal conclusions) suggest that the film's potential anti-Semitism was an "important" reason why Leaf *watched* the film. Those facts do not suggest that he would have *avoided* the film if he had known of its content. *See Zine*, 600 N.W.2d at 398. Because Leaf failed to plead facts plausibly suggesting that he might not have watched the film had he known of its content, he has not pleaded this materiality element with particularity. *See Collins v. A1 Motors, LLC*, 2017 WL 1190932, at *7 (Mich. Ct. App. Mar. 28, 2017) (per curiam); *Vandermale v. Harvey Auto.*, 2005 WL 1459610, at *2 (Mich. Ct. App. June 21, 2005) (per curiam).

In response, Leaf argues that the district court mistakenly concluded that Nike and W+K made no "positive" representations about *The Last Game*—as subsection (cc)'s language requires to trigger any duty to disclose omitted facts. *See* Mich. Comp. Laws § 445.903(1)(cc). According to Leaf, Nike's reassurances in the media that the soccer logo on the clones' uniforms was not a Jewish star and that the company respected all religions sufficed to allege this positive-representation requirement and trigger a duty to disclose the film's offensive content. We need not consider this point. Even if the allegations in the second amended complaint would have sufficed to allege a "positive" representation, Leaf's claim would still fail because he has identified no omitted fact that was "material" to a "transaction."

Leaf also relies on the Michigan court's decision in *Brownlow*. There, the defendant was hired to clean the plaintiffs' home following a small fire. 888 N.W.2d at 297. The defendant used an ozone generator to remove the smell of smoke, and this generator allegedly damaged the home. *Id.* The court held that there was a dispute of fact over whether the defendant had made a "positive"

representation that the generator would remove the smoke odor so as to trigger a duty to disclose that it might also damage the home. *Id.* at 308. In that case, then, a transaction existed (for clean-up services) and the omitted fact (that the ozone generator might damage the home) was material to whether plaintiffs would go through with it. These elements are missing here.

### B. Section 445.903(1)(s)

Leaf thus falls back on a second provision of the Michigan Consumer Protection Act that prohibits a business from "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer." Mich. Comp. Laws § 445.903(1)(s). Unlike subsection (cc), subsection (s) does not include the term "transaction." Like subsection (cc), however, subsection (s) does require a "material fact." And because Michigan courts have defined a "material" fact as one "important" to a transaction, they have repeatedly held that subsection (s) impliedly requires a plaintiff to identify the underlying transaction that the alleged factual omission could affect. *See Zine*, 600 N.W.2d at 398; *see also DiPiero*, 2014 WL 6679406, at *4; *Cap. One Bank*, 2013 WL 6692511, at *5; *Herbrandson*, 2004 WL 316275, at *4. Leaf's claim under subsection (s) thus fails for the same reasons that his claim under subsection (cc) fails: He did not establish that the alleged failure to disclose the hidden offensive content in the Nike ad was "material" to any underlying "transaction."

This claim also fails for an additional reason. Subsection (s) requires that the omitted fact "could not reasonably be known by the consumer." Mich. Comp. Laws § 445.903(1)(s). This element incorporates a form of the "reasonable reliance" requirement from the common law of fraud. *See, e.g.*, *Fox v. Sherwin Williams Co.*, 2010 WL 46905, at *2 (Mich. Ct. App. Jan. 7, 2010) (per curiam); *Evans v. Ameriquest Mortg. Co.*, 2003 WL 734169, at *3 (Mich. Ct. App. Mar. 4, 2003) (per curiam). Leaf must adequately allege that he relied on Nike's failure to disclose the

allegedly offensive content because he could not have reasonably discovered this content on his own. Yet, as the district court noted, his complaints pleaded that he watched the film only after reading a news article in which individuals alleged that it was anti-Semitic. He thus "could reasonably be expected to discover the omission at issue." *Zine*, 600 N.W.2d at 398.

\* \* \*

Leaf ends with a trio of procedural objections to the district court's dismissal of his suit. He suggests that we and the district court should not rely on unpublished Michigan decisions because they lack precedential effect and do not bind Michigan's courts. Yet we routinely rely on these unpublished decisions for their "persuasive" power concerning the substance of Michigan law. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1095–96 (6th Cir. 2010); *see, e.g., Crossing at Eagle Pond Apartments, LLC v. Lubrizol Corp.*, 790 F. App'x 775, 779 (6th Cir. 2019). They persuasively show why Leaf's claims fail here.

Leaf next suggests that the district court improperly considered extrinsic evidence. He correctly notes that if a court relies on outside-the-complaint evidence when ruling on a motion to dismiss, the court must treat the motion as one for summary judgment and give the parties a chance to present relevant evidence. Fed. R. Civ. P. 12(d); *see Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483–85 (6th Cir. 2020). But Leaf wrongly claims that the district court relied on outside-the-complaint materials from one of his other cases when dismissing his complaint in this one. The district court considered the materials in this related case only when unsealing certain exhibits, not when ruling on the merits of the motion to dismiss. Op., R.58, PageID 1805-06. The outside-the-complaint evidence thus did not affect its ruling on the merits.

Leaf lastly argues that the district court showed improper bias against him. That is so, he claims, because the court described his conduct across four similar cases as "sloppy." *Id.*, PageID

13

1806–07. The court noted, among other things, that Leaf had failed to serve some defendants, had voluntarily dismissed other defendants "at an alarming rate," and had filed many irrelevant exhibits. *Id.* It warned him that further wasteful litigation "may well lead to future sanctions." *Id.*, PageID 1807. Like Leaf's prior claims of bias against a state judge, this "accusation is wholly without basis[.]" *Deming v. CH Novi, L.L.C.*, 2013 WL 5629814, at \*1 (Mich. Ct. App. Oct. 15, 2013) (per curiam). Just because a court looks unfavorably on a party's litigation tactics does not make the court improperly biased against that party. *Liteky v. United States*, 510 U.S. 540, 550–51 (1994); *United States v. Parker*, 837 F. App'x 341, 346 (6th Cir. 2020). For this type of criticism to reveal improper bias, the criticism must stem from something that can be described as wrongful (for example, a court's use of some outside-the-lawsuit source that it should not have considered). *Parker*, 837 F. App'x at 346. We see nothing of the sort in the district court's "ordinary efforts at courtroom administration" in this case. *Liteky*, 510 U.S. at 556. Its statements about Leaf's litigation conduct had firm evidentiary support.

At day's end, Leaf claims to have been "outraged" that *The Last Game* contains offensive content that will inflame hatred and violence. Second Am. Compl., R.38, PageID 1531. Even accepting as true his allegations about this offensive content (as we must at this pleading stage), these allegations do not plead the types of commercial harms that the Michigan Consumer Protection Act seeks to remedy. We affirm.